FILED
2012 Jul-30  AM 08:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **DOUGLAS LEE ROLLINS, III,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| **vs.** | ) | Civil Action Number |
| | ) | **2:12-cv-2458-AKK** |
| **THE BOARD OF TRUSTEES** | ) | |
| **OF THE UNIVERSITY OF** | ) | |
| **ALABAMA, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

Before the court is Plaintiff Douglas Lee Rollins, III's ("Rollins") motion for a preliminary injunction. Doc. 1-5. On July 5, 2012, Dr. Michael S. Reddy, Dean of the School of Dentistry ("Dean Reddy") at the University of Alabama at Birmingham ("UAB"), dismissed Rollins from the School of Dentistry ("SOD") for academic reasons. *See* doc. 1-1, at 10. Rollins filed this action in the Circuit Court of Jefferson County, Alabama on July 11, 2012 against the Board of Trustees of the University of Alabama (the "Board") and Dean Reddy in his official capacity. Rollins alleges constitutional due process and equal protection violations arising from his dismissal and seeks declaratory and injunctive relief against both Defendants such that he "can either (1) repeat his first year of dental school . . . or (2) be offered remediation and start his second year of dental school

immediately." *Id.* at 10-12.  Rollins also alleges that he suffered gender discrimination in violation of Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. §§ 1681-1688 (1988), and seeks injunctive and declaratory relief as well as compensatory damages from the Board.  *Id.* at 12-13.  On the day of filing this action, Rollins also obtained an *ex parte* Temporary Restraining Order from the state court judge enjoining Defendants "from preventing Plaintiff from repeating his first year of dental school" and directing Defendants "to allow Plaintiff to enroll as a first year dental school student for the term commencing on Monday, July 16, 2012."  Doc. 2, at 17.

The Board and Dean Reddy properly removed this action on July 13, 2012 pursuant to 28 U.S.C. §§ 1331, 1441, and 1446.  Doc. 1.  This court held a telephone conference with the parties on July 13, 2012 regarding the state court restraining order and Rollins' corresponding motion for a preliminary injunction, *see* doc. 1-5, and, in the interest of preserving the status quo, left the temporary restraining order in tact.[1]  The court, however, also set the preliminary injunction

---

[1] Defendants raised certain objections to the state court's TRO during the telephone conference and in their motion to dissolve, doc. 2—namely, Rollins failed to "certif[y] to the court in writing the efforts, if any, which had been made to give the notice and the reasons supporting the claim that notice should not be required," Ala. R. Civ. P. 65(b), and that the state court improperly granted the TRO without requiring any form of security, Ala. R. Civ. P. 65(c). *See also Spinks v. Automation Personnel Servs., Inc.*, 49 So. 3d 186, 191 (Ala. 2010) ("Alabama law, however, clearly provides that [i]t is *mandatory* that security be given under Rule 65(c), unless the trial court makes a specific finding based upon competent evidence that one or more of the exceptions, stating them, do exist.") (quotation marks and citations omitted, alteration and emphasis in original).  While the court is inclined to agree with Defendants' objections, nonetheless, the court decided to retain the state court's TRO because it would have granted a similar restraining order given the circumstances.

motion for an evidentiary hearing, doc. 3, which the court held on July 19 and 24, 2012.  After considering the evidence presented, for the reasons stated more fully herein, Rollins' preliminary injunction motion is due to be **DENIED** and the state court's temporary restraining order is due to be **DISSOLVED**, *see* doc. 2.  The court will enter a separate Order consistent with this Memorandum Opinion.

## I.    Standard of Review

The Eleventh Circuit instructs that a "district court may grant injunctive relief if the movant shows (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction issues; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party[;] and (4) that if issued the injunction would not be adverse to the public interest."  *All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp.*, 887 F.2d 1535, 1537 (11th Cir. 1989).  Moreover, "'[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the "burden of persuasion" as to the four requisites.'"  *Id.* (quoting *United States v. Jefferson Cnty.*, 720 F.2d 1511, 1519 (11th Cir. 1983)).

## II.    Factual Background

The SOD utilizes Academic Guidelines that govern the academic affairs of students.  (Pl. Exh. 1).[2]  These Guidelines provide in relevant part:

---

[2] Here, the Guidelines at issue are the December 29, 2011 guidelines.  (P. Exh. 1). Rollins presents two other versions dated March 27, 2012, (P. Exh. 18), and July 15, 2012, (P.

## ACADEMIC STATUS

The responsibility of the University of Alabama at Birmingham School of Dentistry (SOD) includes the academic oversight of all students pursuing the DMD degree.  The Academic Performance Committee (APC) is charged with monitoring and assessing the academic status of students in the DMD program.  The Associate Dean of Academic Affairs (Associate Dean) serves as the Chair of the APC.  The APC will meet on a regular basis, but no less frequently than at the close of each term.  The APC will review grades and other material pertinent to student progress and evaluate the information as it relates to established school policy.  Based on this information, the APC will make recommendations to the Associate Dean regarding promotion, probationary status, repetition, remediation, and dismissal.  The final decision of academic status rests with the Associate Dean. These guidelines may be revised periodically, and academic decisions will be governed by the version of the Academic Guidelines in place at the time of the decision.

It should be noted that the APC reviews materials, in addition to grades, when determining promotion recommendations for students. Grades, professionalism including ethics, academic interactions, performance on the National Dental Board Examination, among other relevant indicators are considered in the evaluation process.

. . .

---

Exh. 8), which the court finds irrelevant.  As it relates to the March 27, 2012 version, Dr. Ken Tilashalski ("Dr. Tilashalski"), Associate Dean of Academic Affairs for the SOD, testified that this version is not, and never has been, in effect as it is merely a draft version.  Moreover, the March 2012 version is—for all relevant purposes—identical to the December 2011 Guidelines. *Compare* (P. Exh. 1) *with* (P. Exh. 18).  As it relates to the July 15, 2012 version, it is undisputed that this version came into effect after the SOD dismissed Rollins.  Accordingly, any reliance on this document would be in error.  Most importantly, Rollins failed to demonstrate that the July 15, 2012 version actually changed any procedures regarding remediation, repetition, or dismissal, as opposed to redrafting language of the same procedures.

**Repetition/Dismissal**

A recommendation for repetition of the academic year will be made if the APC determines that a student has the potential to complete the DMD program, but has not met the criteria to justify promotion to the next class level or for graduation . . . . Repetition of a year for academic deficiencies . . . will be allowed to occur only once.

A recommendation for academic dismissal may be made if sufficient evidence exists to indicate that a student will not be able to correct past academic deficiencies within a reasonable period of time.  Once a student has been dismissed for academic reasons or ethics violations, future readmission to the SOD will not be considered.

. . .

Any of the following conditions may justify the APC's recommendation for repetition or dismissal:
- Any failing grade.[3]
- A failing grade and subsequent failure of the remediated course.
- Nonfulfillment of the outlined remediation of a failed course.
- Lack of appropriate professional development.
- Non-compliance with the Student Code of Ethics.
- Continued poor/marginal academic performance.

. . .

---

[3] Rollins also presents a SOD website printout titled "Repetition and Dismissal" which states that "[t]wo or more failing grades during an academic year" are required for dismissal from the SOD.  (Pl. Exh. 13).  Dr. Tilashalski testified that this link existed inadvertently on the internet from the 2008 Academic Guidelines, and, currently, the effective Academic Guidelines are on SharePoint—UAB's intranet system.  Perhaps more importantly, there is no evidence that Rollins knew about or relied on these Guidelines prior to this litigation.

## GUIDELINES FOR APPEAL

### Grade Appeal

A student may appeal a grade in a course if he/she feels one of the following applies: 1.  The grading was not in accordance with published course grading policy; 2.  Inconsistencies were made in application of evaluation standards among students; 3.  A procedural error occurred in establishing the grade (i.e. mathematical error); 4. The grading was arbitrary or capricious; or 5.  The grading was affected by considerations of basis of race, disability, gender, ethnicity, or religious affiliation.

The student should seek resolution using the following steps.

1)     Clarification should be sought from the course director in an attempt to resolve the disagreement without further appeal . . . .

2)     If the matter is not resolved by consultation with the course director, the student may submit a written appeal to the chair of the department in which the course is given . . . .

3)     If the chair's decision is against appeal, the student may make a final appeal to the Associate Dean.  This must be done within two days after the department chair's decision.  The Associate Dean will review the matter and then make a decision whether or not to dismiss the appeal.  If the decision is to hear the appeal, the Associate Dean will appoint an *ad hoc* committee of four faculty members and one student to conduct a hearing . . . . The *ad hoc* committee will make a recommendation to the Associate Dean, whose decision will be final.

### Academic status appeal

If a student believes there is reasonable cause to request an appeal of the decision made by the Associate Dean for dismissal or repetition of a year, the student must address a request in writing to the Chair of

the Faculty Council along with the rationale or basis for the request within one week of the notification of the academic actions.

. . .

The Chair of the Faculty Council will communicate the results of the vote and any recommendations to the Dean and the Associate Dean. The Dean may implement or modify the Faculty Council's recommendation.  The Dean of the SOD or their designee will issue a written final decision to the student via certified mail or hand delivery with copies distributed to the Chairs of the Faculty Council and to the Associate Dean.  The Dean's decision is final for the SOD.

## THE GRADING SYSTEM

Grades are intended to reflect the performance or degree of learning by the individual student.  All grades are assigned after a careful review of information about a student's performance that was obtained in a systematic, reliable, and valid a manner as possible . . . .

*F*     An unacceptable performance.  The *F* grade indicates that the student's performance in the required exercises has revealed poor understanding of the course content and a lack of competency in the stated area.  The APC will make recommendations to the Associate Dean as to whether to allow remediation of the failed course of[sic] if more severe academic action is justified (repetition or dismissal).  If remediation is allowed, the course director must submit to the student, department chair, and the Office of Academic Affairs a Deficient Grade Report Form . . . assessing the student's performance and potential, and outlining a remediation plan.

. . .

## Remediation

Any failing course grade must be remediated.  A fee, as approved by

the University and the [Board], will be charged for any course that is remediated. Remediated courses will have a new course number, and will be graded on the Pass/Fail system. The original course grade as well as the remediated course grade will both appear on student transcripts. Some courses may not offer remediation, as determined by the course director and the Associate Dean. Examples of such courses are large preclinical/clinical courses, and most basic science courses. In the basic science curriculum, an optional comprehensive examination may be offered instead of remediation. If no remediation is offered, the APC may allow a student to remediate the course while repeating the year. The APC and Associate Dean may consider other methods of remediation as well.

*Id.*

### A.    Comparator Students and Courses

In a nutshell, Rollins' case rests on his contention that the SOD treated him less favorably than two similarly situated female students who also failed one of their first year classes.[4] Specifically, Rollins maintains that the SOD allowed these two female students to "remediate" the class they failed (Cardiovascular & Renal Systems), whereas the SOD did not offer him a similar option when he failed Dental Anesthesia. As it relates to the relevant course syllabi for the classes in question, the Cardiovascular & Renal Systems course syllabus stated "Students who receive a grade between 65-69.99 may be eligible for remediation. A remediation exam that will be comprehensive will be scheduled two weeks after the completion of the course. If a student scores above a 70 on the remediation

---

[4] To avoid revealing confidential academic information, the court refers to the two other dental students discussed in this litigation as "Student 1" and "Student 2."

exam, then a grade of 71 will be submitted as your final grade within the course (an equivalent of a C).  If a student fails the remediation exam, then their course grade is what will be reported.  Students who receive a course grade below 65 will receive an F for their grade with NO chance of remediation."  (Pl. Exh. 11).  The course syllabus for Dental Anesthesia provided that Dr. Patrick J. Louis served as the course master, and under section 3 entitled "Remediation"—"Essay exam on selected topics or oral exam."  (Pl. Exh. 4).  Rollins asserts that this language in the syllabus and other SOD policies granted him the automatic right to remediate his failing grade.

 B. Dental Anesthesia Grade

On February 7, 2012, after receiving a failing 67.2% on his Dental Anesthesia midterm exam, *see* (D. Exh. 22), Rollins emailed Dr. Louis about "any suggestion you have for me towards picking up this material."  (Pl. Exh. 9, at *1).  A few days later, after making an appointment, Rollins met with Dr. Louis, and Dr. Louis suggested that Rollins look at old exam material to help study.  While Rollins testified that he had some concern about the honor code policy as it relates to viewing old exams, Dr. Louis testified that he explicitly allowed students to study his old exams.  Thereafter, in late February or early March 2012, Rollins also failed the Dental Anesthesia final exam with a score of 64.1%.  (D. Exh. 22). Nonetheless, Rollins showed no urgency because he believed the clinical portion of the class—a single injection the students gave to each other—would help him pass the class.  However, a few months later, Rollins became concerned because,

on May 23, 2012, Rollins emailed Dr. Louis stating "I am not sure how the injections factor into our averages, but currently my average is a 67.46%.  I am concerned about passing the course and wanted to know how to proceed."  *Id.* at *3.  Dr. Louis testified that he gave all students full credit for participation in the "injections" exercise, as revealed on UAB's BlackBoard system where Rollins discovered his failing class average.  (D. Exh. 22).  In other words, after including the clinical portion of the grade, Rollins still maintained a failing average of 67.46%.

Because Rollins realized that he had failed the class, he made several attempts to contact Dr. Louis, *see* (Pl. Exh. 9, at *2), and finally met with Dr. Louis on June 4, 2012.  Dr. Louis testified that Rollins asked him about remediation and that he informed Rollins that the APC would have to decide whether to allow remediation for the failing grade, and that, if it did, the remediation may include an essay or oral exam.  Later that day, Rollins emailed Dr. Louis with certain "areas where I may have struggled to understand;" Rollins also stated "[w]hen you have decided the appropriate means for remediation please let me know how to proceed."  *Id.* at *4.

C.    Rollins' Efforts After-the-Fact to Change Grade

After meeting with Dr.Tilashalski on June 6, 2012 regarding his academic status, Rollins emailed Dr. Louis on June 7, 2012 and outlined that he learned that he would not have an automatic opportunity to attempt to erase the F as he had initially thought:

I met with Dr. T yesterday and wanted to update you on our discussion.  He said remediation is up to the discretion of the course director.  In other courses this semester, students with an average below 70% were given an opportunity to take a competency exam or final remediation examination.  Upon passing the exam, students were assigned a final average of "C".  However, despite my 67.5% final average, my current understanding as to the means of remediation for your course is different.  There is no opportunity for remediation to obtain a final "C" average.  I don't know why remediation for your course differs from that of other course this semester.  As it stands now, a "F" will appear on my transcript in addition to a $500.00 fine. The "F" will absolutely devastate my GPA.  My case is then presented to an academic performance committee and they will determine the appropriate course of action being one of three things:
> 1. remediate of the course in some fashion
> 2. repeat the entire year
> 3. dismissal

*Id.* at *5 (emphasis added).  Recognizing the severity of the situation, Rollins basically asked Dr. Louis if there was anything Rollins could do after-the-fact to get additional credit:

I would like to inform you I will go to any means necessary to make up the 2.5% deficit for a passing grade in dental anesthesia.  I dearly hope this issue can be resolved between you and I.  I do not want to end up with a "F" for my final average nor incur the $500.00 fine or even worse, repeat the year.  I have been working on the list of subjects you requested during our last meeting regarding clinical complications.  I will have a document for you to review on Monday.  Upon review, I hope you will consider the document as an assignment permitting me to pass the course with a 70%.  I will be available in your clinics to receive your decision.

*Id.* (emphasis added).

Rollins also emailed Dr. Tilashalski on June 7, 2012, inquiring into the

remediation policy for Dental Anesthesia—"Why is the policy for remediation in dental anesthesia different than that for gross anatomy and cardio/renal?  Is it because Dr. Louis does not have as much time for students compared to that [of] Dr. Zehren and Dr. Elzie?  I know students remediated in cardio/renal this year and I feel I was not given the same opportunity towards remediation as those individuals.  They will end up with a C for the course and avoid a $500 fine, where I will have to accept my F, wrecking my GPA, and pay a $500 fine.  I think this is unfair.  I do not think the policy should differ regardless of the course."  (Ct. Exh. 4, at *4).  Rollins continued "[a]lso, why am I just now finding this out?  In other courses, students were notified within a week of there[sic] remediation opportunities by the course instructor.  Dental anesthesia ended in March.  All the communication to voice my concern was done on my behalf and it tooks[sic] 2.5 weeks just to get an appointment.  I think this is unacceptable." *Id.*

Dr. Tilashalski responded the same day on June 7, 2012, explaining to Rollins that:

> We instituted a "retest" in the basic science curriculum only.  This was to be open to students that failed a course within a certain grade range and is not open to any failing grade.  The thought was that since the systems courses build on previously presented material, a student could not progress through the curriculum until they demonstrated understanding of the material—if we did not allow for additional study time and a new final exam, then any failing grade would automatically trigger repetition of the year or dismissal from school.  You are undoubtedly familiar with this process as Dr. Zehren allowed you to retest in Gross Anatomy–even though you should not have been allowed to do so based on your overall average for the course

which was 53.3%, which is well below the allowable range of 60-69% as posted in the course syllabus.[5]

The retest for these select courses is a different process from remediation.

Grades for the term are not due until June 15.  And remediation is not a prerogative of the course director—as we discussed yesterday, allowing for remediation is a determination by the associate dean of academic affairs after consultation with the academic performance committee (APC).  A decision as to whether to allow for remediation will be made after the APC meeting scheduled for June 20.

*Id.* at *3.  Moreover, Dr. Tilashalski testified that during the June 6, 2012 meeting, he discussed the APC procedures and disclosed the members of the APC to Rollins so that Rollins could meet with the committee members if he wanted. Rollins, in fact, met with at least two APC members prior to the June 20, 2012 committee meeting.

In addition to meeting with some APC members, Rollins also tried again to get Dr. Louis to change his grade.  For example, Rollins emailed Dr. Louis on June 11, 2012 and attached "a document I composed regarding clinical complications and anesthesia . . . . I had originally hoped this document could salvage the 2.5 points necessary to pass the course before grades are due at week's end.  Since we last spoke, I had a misunderstanding of remediation.  Apparently,

---

[5] The "Dental Gross Anatomy" syllabus stated that "[s]tudents who earn a grade of 60-69 in the course will be allowed to take a competency exam about one week after the course ends. The competency exam will be comprehensive and will include both a lab and a written component.  If a student receives a grade of 70 or higher on the competency exam, he/she will then receive the lowest possible passing grade for the course (ie, 70=C)."  (D. Exh. 9).

there is a different policy for your course that does in fact differ from the basic science courses with regards to a 'retake' examination[].  Lastly, I am open to the idea of volunteering during any of your continuing education courses to help out in any way.  Please reconsider my final average in your course."  (Pl. Exh. 9, at *6).

D.    APC Meeting and Decision to Dismiss Rollins

In accordance with the Academic Guidelines, the APC met on June 20, 2012, to discuss, among other things, the first year dental students with outstanding failing grades—Student 1, Student 2, and Rollins.  (Ct. Exh. 4, 5). The minutes from this meeting provide that, as it relates to Student 1:

> [F]ailed course #1260 (Cardiovascular & Renal Systems) with a 66% mean average.  She qualified for a comprehensive competency exam, and failed this as well with a 63%.  She was ranked 55/56 students following the fall 2011 term.  She also earned "C" grades in Dental Anesthesia (was one of only 6 students that earned a "C" grade), Periodontology D1 (one of only 8 students that earned a "C" grade), Gross Anatomy, & Neuroanatomy.  She was one of only 10 students to receive a "B" in PCD" Dental Anatomy & one of only 11 students to receive a "B" in PCD: Operative which puts her in the bottom 20 % of the class in the preclinical curriculum as well.  After extensive discussion, the consensus of the committee was that [Student 1] showed enough potential to be allowed to repeat the D1 year in its entirety.

(Ct. Exh. 5, at *1).  For Student 2:

> [F]ailed course #1260 (Cardiovascular & Renal Systems) with a 65% mean average.  She qualified for a comprehensive competency exam, and failed this as well with a 59%.  She was ranked 56/56 students following the fall 2011 term.  She also earned "C" grades in Case-

Based Education 1 (failed the take-home, open book final exam &
was one of only 2 students that earned "C" grades in the course),
Dental Anesthesia (was one of only 6 students that earned a "C"
grade), Medical Emergencies (failed the final exam with a 55% and
was one of only 2 students that earned a "C" grade in the course),
Periodontology D1 (one of only 8 students that earned a "C" grade),
Gross Anatomy (initially failed the class with a 63.5% but qualified
for a comprehensive competency exam and passed with a 84.7%), &
Neuroanatomy.  She was one of only 10 students to receive a "B" in
PCD" Dental Anatomy & one of only 11 students to receive a "B" in
PCD: Operative which puts her in the bottom 20% of the class in the
preclinical curriculum as well.  After extensive discussion, and due to
the global marginal performance in all of her classes, the consensus of
the committee was that [Student 2] be dismissed from the SOD.

*Id.* at *1-2.  Finally, for Rollins, the minutes provide:

Rollins failed course #1215 (Dental Anesthesia).  He ranked 51/56
students following the fall 2011 term.  He also earned "C" grades in
Gross Anatomy (initially failed the class with a 53.3% having failed
all 8 assessments in the course.  According to Dr. Zehren, the course
director, [Rollins'] performance went down toward the end of the
course, as his last exam was a 42% and his last written exam was
44%.  Lee did attend all of the labs and extra help sessions, and
indicated to the course director that he wanted to do well in the course
during an initial talk after his poor performance on the first quiz.  Dr.
Zehren allowed him to take the comprehensive competency exam
even though his overall mean average fell below the cut-off point of
60%, [Rollins] passed the exam with a 80.0%).[6]  He also received "C"
grades in Neuroanatomy and Cardiovascular & Renal Systems.
While he received a "B" grade in Medical emergencies, he failed the
final exam with a 65%).  While he took Fundamentals I & II before

_____

[6] Dr. Tilashalski also forwarded to the APC an email from Dr. Zehren regarding the
decision to allow Rollins to take the competency exam.  According to Dr. Zehren, since he
allowed students in the past to take the competency exam with final averages below 60%, he
afforded Rollins the same chance, and, as Rollins and Student 2 "passed this exam[,] I believe
their understanding of anatomy is adequate for their future career as dentists."  (Ct. Exh. 4, at *5).

admission to the DMD program as masters in science student, he
failed the first two exams in Fundamentals I in the fall of 2011 as a
dental student.  After extensive discussion, the consensus of the
committee was that Mr. Rollins be dismissed from the SOD.

*Id.* at *2.

In light of the APC's decision, Dr. Tilashalski sent Rollins a letter on June

21, 2012 to inform him that "The Academic Performance Committee met and

discussed grades for the year-end review of students.  It was noted that you earned

a failing grade in *Dental Anesthesia (course #1215)*.  Also, it was noted that you

have experienced academic difficulties throughout your D1 year and have

performed marginally in a number of courses.  The Committee recommends that

you be dismissed from the School of Dentistry.  I concur with that

recommendation." (D. Exh. 3).  Dr. Tilashalski personally met with Rollins on

June 22, 2012, and also testified that he explained to Rollins the appeals procedure

for the dismissal and provided the identity of the Faculty Council chair person—to

whom, pursuant to the Academic Guidelines, the appeal is made.

 E. Rollins' Appeal of his Dental Anesthesia Grade

Since Rollins' efforts to get Dr. Louis to change his grade proved

unsuccessful, and, perhaps, in light of the APC's decision, Rollins decided next to

appeal the grade.  Consequently, on June 26, 2012, four days after the APC's

decision to dismiss him from the SOD, Rollins emailed Dr. Louis appealing his

final grade "on the basis of 2. Inconsistencies were made in application of

evaluation standards among students, and 4. the grading was arbitrary, as listed on

page 3 of the UAB Academic Guidelines." (Pl. Exh. 9, at *7). Rollins also provided that "I have been informed from other dental students in a similar situation that their case was handled differently in the past." *Id.* Finally, Rollins asked Dr. Louis to "please consider my previously submitted document, which I have attached below, into your decision as noted in Item #3 of the course syllabus." *Id.* This attachment refers to the 9-page paper Rollins gave to Dr. Louis in hopes of obtaining extra credit after-the-fact. *Id.* at *5 ("I will have a document for you to review on Monday. Upon review, I hope you will consider the document as an assignment permitting me to pass the course with a 70%.").

The next day, June 27, 2012, Rollins emailed Dr. Waite, the department chair, to also appeal his Dental Anesthesia grade. *Id.* at *8. Rollins stated the same basis for appeal as provided to Dr. Louis and also stated that "current students have informed me that under a similar situation, their case was handled differently. Specifically, they passed the course or similar course (Pain & Anxiety) #1207 with a final average below which mine is currently listed." *Id.* Moreover, the email provided that "[m]aterial was submitted to the course director as requested, but I have not received a response regarding this decision. Attached is the material I submitted to him. It is a nine page document regarding clinical complications and anesthesia." *Id.* Rollins also asked Dr. Waite "how to proceed with you to resolve this issue." *Id.*

Dr. Louis responded on June 30, 2012 providing "I have reviewed the recommendation from the APC and your appeal. Unfortunately, based on all of

the information I am denying your grade appeal and your request to remediate. Your appeal will be reviewed by the chair of our department, Dr. Peter Waite." *Id.* at *10. In turn, Dr. Waite emailed Rollins on the same day, stating that "I reviewed your appeal, academic record and discussed this with Dr. Louis. I do not find grounds to reverse his decision. Unfortunately you did not pass the course. I am sorry." *Id.* at *11. Subsequently, Rollins replied to Dr. Waite asserting that "my request to Dr. Louis, as discussed in a previous meeting, was for remediation as provided in the Dental Anesthesia #1215 syllabus under item #3. I was never afforded this opportunity. Could you please explain the reasoning for your decision." *Id.* at *12.

     F.    <u>Rollins' Appeal of his Dismissal</u>

On June 28, 2012, pursuant to the Academic Guidelines, Rollins appealed his dismissal to the Faculty Council. (D. Exh. 23). Dr. John Ruby, Chair of the Faculty Council, sent Dean Reddy a letter on July 5, 2012, stating that "[o]n Tuesday, 07/03/2012, Faculty Council met from 4:00 PM to 7:00 PM to conduct a hearing of dental student appeals regarding their academic status as determined by the Academic Performance Committee. The meeting was conducted in accordance with the Academic Status Appeal of the School of Dentistry's Academic Guidelines *(revised 12/29/2011)*. A majority ruling by secret ballot indicated that Faculty Council was in agreement with the Academic Performance Committee decision: 1) [Student 1] be allowed to repeat D1 year in its entirety, 2) [Student 2] be dismissed from the School of Dentistry, 3) Douglas Lee Rollins be dismissed

from the School of Dentistry."  (D. Exh. 5).

The minutes from the Faculty Council's meeting establish that Dr. Tilashalski provided the Council with minutes from the June 20, 2012 APC meeting; "Laura Cotlin, Faculty Council, obtained additional information on the performance of [student 2] and [Rollins] regarding their failing grades in Gross Anatomy;" "[a]n Academic History Report was obtained from Dr. Steve Filler;" and "class standing and grades were available for each student."  (Ct. Exh. 6, at *1).  Moreover, "[i]t was noted that: [Student 1] had a class rank of 55/56 and a F in Cardiovascular & Renal Systems; [Student 2] had a class rank of 56/56 and a F in Cardiovascular & Renal Systems; [Rollins] had a class rank of 54/56 and a F in Dental Anesthesia."  *Id.*  After stating that Dr. Tilashalski presented the APC's justifications for each recommendation, the minutes note that "[i]n addition [] Rollins' paper entitled 'Clinical Complications' was handed to Dr. Louis as an unsolicited document and was not authorized as remediation for failing the Dental Anesthesia course.  Moreover, Dr. Tilashalski found evidence of potential plagiarism in 'Clinical Complications' utilizing an academic plagiarism detector (www.turnitin.com).  Also, Dr. Ruby indicated that [student 2] and [Rollins] failed his open-book cariology essay exam that was part of their PCD: Operative course, and after handing out these examinations Dr. Ruby asked that all students that failed the examination to please come in and talk to him within the next 2 weeks—Mr. Rollins and [student 2] never came in to discuss why they failed this examination.  There were concerns that Mr. Rollins should not have been given a

competency examination in Gross Anatomy since his failing average was 53." Dr. Tilashalski then excused himself from the Faculty Council meeting. *Id.* at *1-2.

Additionally, the Faculty Council heard presentations from Rollins, Student 1, and Student 2. The minutes provide that "Rollins had Dr. Merrie Ramp as a witness—her comments were complimentary. Dr. Patrick Louis recused himself during Mr. Rollins' oral presentation[7] . . . . Prior to entering dental school [Rollins] was a graduate student of Oral Biology at UAB dental school and was not granted a M.S. degree since his overall grade point average was < 3.0 although he did complete a thesis defense." *Id.* at *2. Following the student presentations, the Faculty Council met in closed session to discuss each student's appeal. By secret ballot, the Council upheld the decision to dismiss Rollins from the SOD—seven votes in favor and none opposed. *Id.* at *3.

### III.   Analysis

Rollins asserts constitutional violations of procedural due process, substantive due process, and equal protection, *see* 42 U.S.C. § 1983,[8] and Title IX

---

[7] Dr. Louis testified that he left the room to allow Rollins to speak freely about Dr. Louis and the Dental Anesthesia class.

[8] "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ." 42 U.S.C. § 1983.

violations, *see* 20 U.S.C. § 1681(a).[9]  The court finds that Rollins failed to demonstrate a substantial likelihood of success for each claim and therefore cannot satisfy the heavy burden warranting a preliminary injunction.  The court will address each individual claim in turn; however, before addressing the merits, the court notes that the Eleventh Circuit recently reiterated that "no tenet of constitutional law is more clearly established than the rule that a property interest in continued enrollment in a state school is an important entitlement protected by the Due Process Clause of the Fourteenth Amendment."  *Barnes v. Zaccari*, 669 F.3d 1295, 1305 (11th Cir. 2012) (citing *Gross v. Lopez*, 419 U.S. 565, 576 n.8 (1975) ("[T]he lower federal courts have uniformly held the Due Process Clause applicable to decisions made by tax-supported educational institutions to remove a student from the institution long enough for the removal to be classified as an expulsion.")).[10]

A.   Procedural Due Process

"With respect to the procedural due process claim, the legal standard governing academic dismissals was enunciated in the Supreme Court's decision"

---

[9] "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."  20 U.S.C. § 1681(a).

[10] Conversely, the court notes that the Supreme Court in *Board of Curators of the University of Missouri v. Horowitz*, 435 U.S. 78, 84-85 (1978), and *Regents of the University of Michigan v. Ewing*, 474 U.S. 214, 222-23 (1985)—the two seminal cases on due process rights in the academic dismissal context—merely assumed, without deciding, the existence of a constitutionally protectible property right in continued enrollment at a state university.

in *Board of Curators of the University of Missouri v. Horowitz*, 435 U.S. 78, 86 (1978). *Haberle v. Univ. of Ala. at Birmingham*, 803 F.2d 1536 (11th Cir. 1986). Generally, "'[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation.'" *Horowitz*, 435 U.S. at 86 (quoting *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 (1961)). And indeed, the Court maintained that this "need for flexibility is well illustrated by the significant difference between the failure of a student to meet academic standards and the violation by a student of valid rules of conduct. This difference calls for far less stringent procedural requirements in the case of an academic dismissal." *Id.* Put differently, "[a]cademic evaluations of a student, in contrast to disciplinary determinations, bear little resemblance to the judicial and administrative fact-finding proceedings to which we have traditionally attached a full-hearing requirement." *Id.* at 89. "Like the decision of an individual professor as to the proper grade for a student in his course, the determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking." *Id.* at 90.

Accordingly, the Court refused to require a hearing for academic dismissals, and, as such, declined "to further enlarge the judicial presence in the academic community and thereby risk deterioration of many beneficial aspects of the faculty-student relationship." *Id.* Thus, based on *Horowitz*, the Eleventh Circuit established that, for academic dismissals, "the decision-making process need only

be 'careful and deliberate'" to survive a procedural due process challenge. *Haberle*, 803 F.2d at 1539 (quoting *Horowitz*, 435 U.S. 85-87).

Here, Rollins focuses on two alleged procedural due process violations: (1) unestablished and arbitrary course remediation procedures and (2) the timing of the APC's recommendation for dismissal compared to the availability of a grade appeal. *See* doc. 1-1, at 9-10. Unfortunately for Rollins, he failed to establish a substantial likelihood of success on either purported violation.

### 1.   Alleged Arbitrary Remediation Procedures

Throughout the preliminary injunction hearing, Rollins primarily argued that Defendants utilized arbitrary procedures for determining whether to allow remediation for a failing grade. Rollins contends that while certain courses allowed for "automatic" remediation, Defendants failed to offer remediation for the class he failed—Dental Anesthesia. However, the Academic Guidelines and Dr. Tilashalski's testimony reveal a convincing justification for the policy distinction. Beginning approximately four years ago, the SOD changed its policies for basic science courses, such as Gross Anatomy and Cardiovascular & Renal Systems, to allow students to retake a "comprehensive competency" exam if he or she receives a failing grade within a certain range (e.g. between 65-69 or 60-69). *See* (D. Exh. 9); (Pl. Exh. 11). The SOD implemented this policy because these courses are foundational in nature, and a student cannot continue his or her studies without an adequate knowledge of the given basic science. To account for the foundational nature of the classes, the SOD allows the students to take a

comprehensive exam to salvage a failing grade in the course.  Under this system, although the student ended the class with a failing average, a student only "fails" one of these courses if he or she fails the comprehensive competency exam.  In contrast, other courses, that are not as "foundational," may offer a distinct "remediation" for a failing course grade.  However, in these courses, the "F" actually is reflected in the transcript and, significantly, the decision to allow remediation rests with the Associate Dean at the recommendation of the APC—"The APC will make recommendations to the Associate Dean as to whether to allow remediation of the failed course [or] if more severe academic action is justified (repetition or dismissal)."  (P. Exh. 1).  Put simply, based on the policies and overwhelming testimony, the SOD offers a competency exam in certain basic courses that the SOD decided could not be singularly "remediated" and that would necessarily require repetition or dismissal upon a failing grade.  *See* (Ct. Exh. 4, at *3).[11]  Likewise, the weight of the evidence does not support Rollins' contention that he had an automatic right to remediation in non-basic courses.  Based on the evidence before this court, the decision to distinguish basic science classes from other classes was "careful and deliberate," and, as such, survives Rollins' procedural due process challenge.

Furthermore, Rollins failed to establish a substantial likelihood that, from a

---

[11] To the extent Rollins maintains that Defendants violated due process by denying "mandatory remediation," the court hesitates to even assume some constitutionally protected property right in remediation of a dental school class.  *See Barnes*, 669 F.3d at 1305.

procedural standpoint, the decision to dismiss—rather than allow remediation of Dental Anesthesia—violated due process.  Pursuant to the Academic Guidelines, "any failing grade" may justify the APC's recommendation for repetition or dismissal.  (P. Exh. 1).  As Rollins failed Dental Anesthesia, the APC met on June 20, 2012, and discussed Rollins' course failure, as well as his overall academic performance, *see* (Ct. Exh. 5, at *2), as allowed by the Guidelines.  *See* (P. Exh. 1) ("It should be noted that the APC reviews materials, in addition to grades, when determining promotion recommendation for students . . . .").  Indeed, even Rollins' own advisor and supporter, Dr. Merrie Ramp, a member of the APC, testified that the APC looks at a student's full body of work.  In that regard, based on Rollins' entire performance as a first year, which included the F in Dental Anesthesia and failing sixteen exams during the school year, the APC recommended dismissal, and Dr. Tilashalski, the Associate Dean, accepted this recommendation as his decision.  *See id.* ("A recommendation for academic dismissal may be made if sufficient evidence exists to indicate that a student will not be able to correct past academic deficiencies within a reasonable period of time.").

Moreover, consistent with the SOD policies, Rollins appealed the dismissal and received a formal hearing by the Faculty Council.  (Ct. Exh. 6).  The Faculty Council received the APC's minutes and a presentation regarding the APC's recommendation by Dr. Tilashalski, reviewed Rollins' failing exams and overall grades including an Academic History Report, and considered Rollins' pre-dental school academic history at UAB.  *Id.* at *1-2.  Dr. Tilashalski also presented the

"Clinical Complications" paper Rollins prepared for Dr. Louis and included with it a report by "turnitin.com"—an academic plagiarism detector. *Id.* Additionally, the Faculty Council heard testimony from Rollins and his faculty advisor, Dr. Ramp. Thereafter, following deliberation, the Council voted by secret ballot and unanimously approved the Associate Dean's dismissal. *Id.* at *3. Finally, Dean Reddy adopted the Faculty Council's decision.

Given the extensive levels of review provided before dismissing Rollins, based on the evidence presented at the injunction hearing, Defendants' procedures appear sufficiently "clear and deliberate." In fact, the court notes that the procedures utilized by Defendants are substantially similar to those accepted by the Supreme Court in *Horowitz*. The plaintiff in *Horowitz*, a former University of Missouri-Kansas City medical student, performed poorly on her "rotational units," and the "Council on Evaluation" recommended that plaintiff "be dropped from the school." 435 U.S. at 81. The plaintiff finished the semester on a probationary status, and after receiving all rotation reports, the Council on Evaluation reaffirmed its recommendation to dismiss plaintiff from the medical school. The Coordinating Committee and Dean approved the recommendation. Plaintiff appealed the decision to the Provost, who "sustained the school's actions after reviewing the record compiled during the earlier proceedings." *Id.* at 81-82. Thus, the plaintiff in *Horowitz* received no opportunity to present witnesses or evidence on her behalf, and the Court still found "[t]he ultimate decision to dismiss [plaintiff] [] careful and deliberate." *Id.* at 85. Similar to the plaintiff in

*Horowitz*, Rollins also cannot legitimately claim lack of notice as the Academic Guidelines establish that a failing grade may result in dismissal.  *See* (P. Exh. 1).

Additionally, in *Haberle*, the Eleventh Circuit accepted UAB's *ad hoc* procedures prior to dismissing a student where UAB (1) afforded the student two opportunities to take a preliminary qualifying examination, (2) allowed the student to discuss his dismissal with the co-dean of the graduate school, the graduate committee, and the Dean of the School of Natural Sciences and Mathematics, and (3) appointed an impartial committee to review his complaint after he submitted any further information to support his contentions.  *See* 803 F.2d at 1539.  In contrast, here, since Defendants posted the Academic Guidelines to all dental students, and these Guidelines specifically established the multiple level review processes used by Defendants to dismiss Rollins—rather than utilizing the *ad hoc* procedures the Eleventh Circuit *still accepted*—the procedural due process claim regarding dismissal is likely to fail.

### 2.   Alleged Timing Deficiencies

As additional grounds for a purported procedural due process violation, at the preliminary injunction hearing, Rollins also repeatedly addressed the timing of the APC's recommendation for dismissal and any available grade appeal.  It is undisputed that the APC meets to discuss each student's academic record and the possibility of remediation, repetition, or dismissal, and that this meeting occurs before final grades are posted.  Accordingly, Rollins argues that the APC decided to dismiss him before he had a chance to appeal his failing grade in Dental

Anesthesia.  The court disagrees that Rollins is likely to prevail on this theory because Dr. Tilashalski testified that the APC would have reconvened to possibly amend the dismissal decision had Rollins succeeded on a grade appeal.  In fact, Dr. Tilashalski testified that this sequence of events occurred recently where the APC subsequently changed its recommendation for a dismissal after a successful grade appeal.

Ultimately, however, Rollins' due process arguments as related to his grade appeal are doomed by his failure to exhaust the "grade appeal" process outlined by the Academic Guidelines.  Rollins properly appealed his final grade to Dr. Louis and then the department chair, Dr. Waite.  (Pl. Exh. 9, at *7-8).  However, Rollins admits that he failed to make a final *grade* appeal to the Associate Dean as required by the Academic Guidelines.  (Pl. Exh. 1).  Rollins tries to overcome this flaw by contending that he fully appealed his dismissal to the Faculty Council.  (D. Exh. 23).  This contention is unavailing because, as delineated by the Guidelines, an "academic status" appeal differs from a "grade appeal," and Rollins only utilized the first two steps of the "grade appeal" process.  Moreover, even though the Associate Dean is a member of the APC and the final arbiter of a "grade appeal," the Academic Guidelines allow for different committees to hear these different appeals.  Because Rollins presents no evidence that he specifically sought the final "grade appeal" step, the court finds little likelihood of success regarding the purportedly inadequate process for grade appeals.  Put differently, the court cannot find that Defendants provided inadequate process when Rollins

never exhausted the processes offered.

In sum, Defendants provided Rollins with an extensive framework to appeal and dispute any adverse actions—the very key to the Fourteenth Amendment's procedural due process protections.  In turn, Rollins establishes insufficient, if any, evidence that Defendants failed to act clearly and deliberately by denying remediation of Dental Anesthesia and dismissing Rollins.  As the Supreme Court succinctly put it, "'[j]udicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint . . . . By and large, public education in our Nation is committed to the control of state and local authorities.'  We see no reason to intrude on that historic control in this case." *Horowitz*, 435 U.S. at 91 (quoting *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968)).  The need to refrain from intruding is even more prevalent where, as here, Rollins failed to fully utilize the procedures to challenge his grade and the SOD afforded him sufficient opportunity to challenge his dismissal.

B.  Substantive Due Process

Similar to procedural due process, "the Supreme Court laid out a very narrow standard of substantive review over academic decisions."  *Haberle*, 803 F.2d at 1539 (citing *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214 (1985)).  The Court in *Ewing* held that "[w]hen judges are asked to review the substance of a genuinely academic decision, such as this one, they should show great respect for the faculty's professional judgment.  Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate

that the person or committee responsible did not actually exercise professional judgment." 474 U.S. at 225. Indeed, the Court quoted *Horowitz* for the proposition that "[u]niversity faculties must have the widest range of discretion in making judgments as to the academic performance of students and their entitlement to promotion or graduation." *Id.* at 225 n.11. Stated simply, the decision to dismiss the plaintiff in *Ewing* "rested on an academic judgment that is not beyond the pale of reasoned academic decision-making when viewed against the background of [plaintiff's] entire career at the University of Michigan, including his singularly low score on the NBME Part I examination." *Id.* at 227-28. *See also id.* at 230 (Powell, J., concurring) ("Judicial review of academic decisions, including those with respect to the admission or dismissal of students, is rarely appropriate, particularly where orderly administrative procedures are followed—as in this case.").

Rollins raises the following alleged violations of his substantive due process rights: (1) Defendants disregarded the SOD's mandatory remediation policy, (2) the APC and Faculty Council arbitrarily and improperly considered Rollins' pre-dental school academic work and "Clinical Complications" paper, (3) Dr. Louis and Dr. Waite's votes for dismissal in the Faculty Council constituted bias, and (4) Dr. Waite failed to spend adequate time considering Rollins' grade appeal. *See* doc. 1-1, at 9-10. The court will address each allegation specifically.

### 1. Alleged Mandatory Remediation Requirement

First, in addition to claiming that Defendants instituted a procedurally

deficient remediation policy, Rollins contends that Defendants acted arbitrarily and capriciously by failing to adhere to the SOD's "mandatory remediation" policy.  To support the argument that the SOD utilizes a *mandatory* remediation policy, Rollins myopically focuses on the Academic Guidelines' language: "[a]ny failing course grade must be remediated."  (P. Exh. 1).  However, this contention is likely to fail because Defendants convincingly demonstrate that Rollins takes this language out of context.  Indeed, based on this court's review, the Academic Guidelines' plain language states unequivocally that the "remediation" decision rests with the APC.  After reviewing each student's academic performance at the end of each semester, "the APC will make recommendations to the Associate Dean regarding promotion, probationary status, repetition, *remediation*, and dismissal." *Id.* (emphasis added).  More specifically, if a student receives an "F" in a course, "[t]he APC will make recommendations to the Associate Dean *as to whether to allow remediation* of the failed course of[sic] if more severe academic action is justified (repetition or dismissal).  *If remediation is allowed*, the course director must submit to the student, department chair, and the Office of Academic Affairs a Deficient Grade Report Form . . . ." *Id.* (emphasis added).  The next section that addresses "Remediation"—and the only one that Rollins wants this court to read— is only reasonably read in light of the proceeding paragraphs as applicable "if remediation is allowed."  As such, "if remediation is allowed," then "[a]ny failing course grade must be remediated."  *Id.*  Put differently, as the witnesses testified ad nauseam, if the APC recommends remediation, a student *cannot* reject it and

opt to accept the failing grade and move on to other classes.

In rejecting Rollins' reading of the Guidelines, the court notes that each SOD faculty member, including Dr. Merrie Ramp, Rollins' academic advisor, testified that remediation is at the discretion of the Associate Dean by recommendation of the APC—not the individual course director.  Moreover, Dr. Tilashalski's June 7, 2012 email to Rollins specifically explains the "remediation" policy, and how this policy differs from the "retest" policy available in the basic science courses.  (Ct. Exh. 4, at *3).  And, in fact, Rollins' email to Dr. Louis on June 7, 2012 reflects an understanding that, if Dr. Louis refused to change his grade, "[m]y case is then presented to an academic performance committee and they will determine the appropriate course of action being one of three things: 1. remediate of the course in some fashion[,] 2. repeat the entire year[,] 3. dismissal." (Pl. Exh. 9, at *5).  Finally, Rollins' June 11, 2012 email to Dr. Louis states "[s]ince we last spoke, I had a misunderstanding of remediation.  Apparently, there is a different policy for your course that does in fact differ from the basic science courses with regards to a 'retake' examination[]."  (Pl. Exh. 9, at *6).  In other words, the evidence falls significantly short of supporting Rollins' contention that remediation is mandatory at the SOD for all courses.

Alternatively, Rollins contends that, even if remediation is not mandatory, Defendants arbitrarily disregarded the remediation policy based on Dr. Louis' June 30, 2012 email stating "I have reviewed the recommendation from the APC and your appeal.  Unfortunately, based on all of the information I am denying your

grade appeal and your request to remediate." (Pl. Exh. 9, at *10). Basically, Rollins argues that this email reveals that Dr. Louis, rather than the APC, decided to reject Rollins' request for remediation. The court disagrees for several reasons. First, Rollins received Dr. Louis' email ten days after the APC met to recommend dismissal rather than remediation, (Ct. Exh. 5), and nine days after Dr. Tilashalski informed Rollins of this recommendation and decision, (D. Exh. 3). This evidence establishes unequivocally that the APC, rather than Dr. Louis, made the decision to deny remediation. Second, Rollins takes Dr. Louis' statement out of context and overlooks that the email is a response to an email where Rollins appeals his Dental Anesthesia grade and asks Dr. Louis to "please consider my previously submitted document, which I have attached below, into your decision as noted in Item #3 of the course syllabus" (the remediation section). (Pl. Exh. 9, at *7); (Pl. Exh. 4). In a nutshell, Rollins wanted Dr. Louis to allow him to "remediate" through the unsolicited paper that Rollins submitted after he failed the class. Dr. Louis' response reveals simply that he denied the grade appeal, and pursuant to the APC's decision to recommend Rollins' dismissal, also had to deny Rollins' request to remediate after-the-fact with the nine page "Clinical Complications" paper. *See* (Pl. Exh. 9, at *10). As Dr. Louis testified, it would be unethical for him to change a grade based on additional work a student submits after-the-fact or simply because the student wants a higher grade. In any event, there is no indication that, in this June 30, 2012 email, Dr. Louis acted outside the accepted norms of professional judgment. *See Haberle*, 803 F.2d at 1539.

2.     Alleged Improper Reliance on Pre-Dental School Academic
       Work and Plagiarism Allegation

Next, as a second ground for an alleged substantive due process violation,

Rollins claims that the APC and the Faculty Council improperly considered his

pre-dental school academic performance and the potential plagiarism in his

"Clinical Complications" paper.  As it relates to Rollins' pre-dental school

academic record, Rollins attempted to obtain an oral biology masters degree at

UAB prior to admission into the SOD.  In this masters program, Rollins took two

dental school classes, Fundamentals I and II, and received a "C" in each class.

(Ct. Exh. 1).  Dr. Tilashalski testified that, while Rollins successfully defended his

masters thesis and had taken enough course hours to obtain his masters degree,

Rollins never received the degree because he failed to obtain the requisite GPA.[12]

Additionally, upon entry to the SOD, Rollins failed the first two exams in

Fundamentals I, a class he had previously taken—although, Rollins ultimately

received a final "B" grade in both Fundamentals I and II.  (Ct. Exh. 1).  Rollins

contends that the APC and Faculty Council violated his substantive due process

rights when they considered this information in the decisions to dismiss.  (Ct. Exh.

---

[12] Rollins takes issue with this assertion and claims that he did not obtain his masters
degree because of his decision to enroll in the SOD.  Rollins may well have obtained this degree
eventually.  Nonetheless, Dr. Tilashalski's contention that Rollins failed to obtain the necessary
GPA for the degree is true.  As Dr. Tilashalski testified and as the transcripts show, *see* (Ct. Exh.
1), Rollins had taken the required hours to qualify for the degree but his GPA fell below the
requisite level to graduate with a degree.  Rollins' contention that he would have raised his GPA
eventually but for his decision to enroll at the SOD does not negate Dr. Tilashalski's statement
that Rollins failed to receive a degree because of the GPA he earned.

5, at *2); (Ct. Exh. 6, at *2).  This contention is also unavailing because the Academic Guidelines provide that "[i]t should be noted that the APC reviews materials, in addition to grades, when determining promotion recommendations for students," and "[a] recommendation for academic dismissal may be made if sufficient evidence exists to indicate that a student will not be able to correct past academic deficiencies within a reasonable period of time." (Pl. Exh. 1).  Rollins' pre-dental school academic performance, especially that of related subject matters, certainly provides relevant information on the ability to maintain the required standards of a SOD student.  The court passes no judgment on Rollins' academic capacity, but, rather, finds that the Defendants' use of this information is most likely still within the realm of reasonable "professional judgment."  *Haberle*, 803 F.2d at 1539.

As it relates to the "Clinical Complications" paper, *see* (D. Exh. 12, 26), Rollins submitted to Dr. Louis and eventually read and analyzed for plagiarism by Dr. Tilashalski, the court again finds insufficient evidence of impropriety.  Taken in the light most favorable to Rollins, he submitted this paper to Dr. Louis as an unsolicited attempt to "remediate" Dental Anesthesia, or, put differently, to demonstrate adequate competence in the subject matter to receive a passing grade. *See* (Pl. Exh. 9, at *6-8).  As discussed previously, the Faculty Council reviews appeals from the APC, and, for dismissals, considers whether "sufficient evidence exists to indicate that a student will not be able to correct past academic deficiencies within a reasonable period of time." (Pl. Exh. 1).  The Faculty

Council's minutes establish that Dr. Tilashalski presented this paper to the Council along with a "turnitin.com" report.[13]  (Ct. Exh. 6, at *1).  An academic paper submitted by the dismissed student is certainly relevant to ascertain the ability to correct certain deficiencies, and Dr. Tilashalski's use of "turnitin.com" simply offers additional evidence regarding possible plagiarism and thus the "academic rigor" of the paper.  Again, courts must "show great respect for the faculty's professional judgment," and the Faculty Council's consideration of Rollins' paper, with the turnitin.com report, is highly unlikely to represent a "substantial departure from accepted academic norms."  *Haberle*, 803 F.2d at 1539.

### 3.    Alleged Bias of Drs. Louis and Waite

As a third purported violation of substantive due process, Rollins argues that Dr. Louis and Dr. Waite's Faculty Council votes for dismissal were biased due to previous judgments made about him.  Stated differently, Rollins contends that these two individuals "had clear bias and w[ere] not [] objective committee member[s], given that [they] had already pre-judged the merits of the appeal." Doc. 1-1, at 10.[14]  The court disagrees because these two professors "pre-judged" (if anything) Rollins' *grade appeal*, not the academic status decision of dismissal. The Academic Guidelines provide two separate processes for academic status

---

[13]  This website produces an "Originality Report" that matches the submitted document with other published sources.  See (D. Exh. 13).

[14]  The Complaint contends that Dr. Waite improperly voted on the Academic Performance Committee, *see* doc. 1-1, at 10; however, the evidence reveals that Dr. Waite served on the Faculty Council, (Ct. Exh. 6), not the APC, (Ct. Exh. 5).

appeals and grade appeals.  (Pl. Exh. 1).  After the Associate Dean and APC

decided to dismiss Rollins, he appealed this decision to the Faculty Council which

included committee members Drs. Louis and Waite.  (D. Exh. 23).  Conversely,

Rollins appealed his Dental Anesthesia grade first to his course director, Dr.

Louis, and subsequently to the department chair, Dr. Waite—which both

professors denied.  (Pl. Exh. 9, at *10-11).  Thus, the evidence offers no support

that Dr. Louis or Dr. Waite had a preconceived bias as it relates to Rollins'

dismissal, as opposed to the grade appeal.[15]

Furthermore, the Eleventh Circuit instructs that "[a]n impartial decision-

maker is an essential guarantee of due process."  *Nash v. Auburn Univ.*, 812 F.2d

655, 665 (11th Cir. 1987).  However, in "*Duke* we refused 'to establish a *per se*

rule that would disqualify administrative hearing bodies . . . solely for the reason

that . . . some of [the members] participated in the initial investigation of the

incident and initiation of the cause under consideration.'"  *Id.* at 666 (quoting *Duke*

*v. N. Tex. State Univ.*, 469 F.2d 829, 834 (5th Cir. 1972)).  "'The record must

support actual partiality of the body or its individual members.'"  *Id.* (quoting

*Megill v. Bd. of Regents*, 541 F.2d 1073, 1079 (5th Cir. 1976)).  Here, Rollins

failed to show any alleged partiality by the Faculty Council.  In fact, Rollins fails

to present any evidence that, assuming Dr. Louis and Dr. Waite had recused

---

[15] A better case for bias would exist if Rollins actually took the final step of a grade
appeal, and the Associate Dean's *ad hoc* committee consisted of Dr. Louis and/or Dr. Waite, *see*
(Pl. Exh. 1); however, as stated previously, Rollins failed to take this final step pursuant to the
Academic Guidelines.

themselves from the Faculty Council vote, the Faculty Council would have reached a different decision on the appeal of his dismissal.  The evidence here shows that the Faculty Council voted by secret ballot to uphold Rollins' dismissal "seven votes in favor and none opposed."  (Ct. Exh. 6, at *3).  Thus, even eliminating Dr. Louis and Dr. Waite still results in a unanimous vote against Rollins.

4.     Alleged Failure to Properly Consider Grade Appeal

Fourth and finally, Rollins alleges that Dr. Waite failed to adequately consider his grade appeal.  Although Dr. Louis testified that he discussed Rollins' Dental Anesthesia final grade with Dr. Waite before June 30, 2012, at 5:05 P.M. on June 30, 2012, Dr. Louis denied Rollins' grade appeal, (Pl. Exh. 9, at *10), and approximately one hour later, at 6:13 P.M. on June 30, 2012, Dr. Waite found no "grounds to reverse" Dr. Louis' decision, *id.* at *11.  Basically, despite appealing his grade to Dr. Waite on June 27, 2012, *id.* at *8, i.e. three days before Dr. Waite answered his appeal, Rollins focuses on the one hour gap between Drs. Louis and Waite's response to maintain that Dr. Waite only considered the appeal for an hour.  This contention is speculative at best and, as such, carries no evidentiary weight.  Moreover, given the narrow standard to review substantive academic decisions, *see Ewing*, 474 U.S. at 225, the court finds no indication of arbitrary or capricious conduct by Dr. Waite.  In other words, Rollins failed to demonstrate to the court why an hour is insufficient to review a final grade for the objective, multiple choice, and computer graded examinations given in Dental Anesthesia.

To conclude, Rollins' substantive due process arguments are precisely the type of allegations that led the Supreme Court to hold: "If a 'federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies,' *Bishop v. Wood*, 426 U.S. 341, 349, 96 S. Ct. 2074, 2079, 48 L. Ed.2d 684 (1976), far less is it suited to evaluate the substance of the multitude of academic decisions that are made daily by faculty members of public educational institutions—decisions that require 'an expert evaluation of cumulative information and [are] not readily adapted to the procedural tools of judicial or administrative decisionmaking.' *Board of Curators, Univ. of Mo. v. Horowitz*, 435 U.S., at 89-90, 98 S. Ct., at 954-955." *Ewing*, 474 U.S. at 226. Thus, by producing only sparse, if any, evidence of arbitrary or capricious conduct, Rollins failed to satisfy the preliminary injunction burden for a purported violation of substantive due process. *See All Care Nursing*, 887 F.2d at 1537.

C.    Equal Protection and Title IX

"[T]he Equal Protection Clause requires government entities to treat similarly situated people alike." *Campbell v. Rainbow City, Ala.*, 434 F.3d 1306, 1313 (11th Cir. 2006). To sufficiently state a claim, the plaintiff "must allege that 'through state action, similarly situated people have been treated disparately,' *Thigpen v. Bibb County Sheriff's Dep't.*, 223 F.3d 1231, 1237 (11th Cir. 2000), and put forth evidence that [defendant's] actions were motivated by" gender. *Draper v. Reynolds*, 369 F.3d 1270, 1278 n.14 (11th Cir. 2004). *See also* 42 U.S.C. § 1983.

Other circuits generally assess "Title IX discrimination claims under the same legal analysis as Title VII claims." *Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172 (10th Cir. 2001); *Wolfe v. Fayetteville, Ark. Sch. Dist.*, 648 F.3d 860, 865 n.4 (8th Cir. 2011); *Torres v. Pisano*, 116 F.3d 625, 630 n.3 (2d Cir. 1997) ("We have held that Title VII principles apply in interpreting Title IX."); *Preston v. Virginia ex rel. New River Cmty. College*, 31 F.3d 203, 206 (4th Cir. 1994) ("We agree that Title VII, and the judicial interpretations of it, provide a persuasive body of standards to which we may look in shaping the contours of a private right of action under Title IX.").  However, in holding that a private plaintiff may not recover compensatory damages pursuant to Title IX, the Eleventh Circuit stated:

> [Plaintiff] has invited this court to apply a Title VII analysis to this case.  Titles VI and IX, as well as Title VII, all have an antidiscrimination purpose.  But while Titles VI and IX speak in terms of conditional grants which may be terminated if discrimination occurs under any federally funded program, Title VII (which we find unnecessary to extensively analyze for these purposes) speaks in terms of outright prohibitions, making discrimination in an employment setting an unlawful employment practice.  *See, e.g.* 42 U.S.C. § 2000e-2.  We do not believe applying Title VII to Title IX would result in the kind of orderly analysis so necessary in this confusing area of the law.  For this reason, we decline to do so.

*Franklin v. Gwinnett Cnty. Pub. Sch.*, 911 F.2d 617, 622 (11th Cir. 1990), *reversed on other grounds by Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60 (1992).  In reversing the Eleventh Circuit as it relates to the available *remedies* under Title IX—thereby finding compensatory damages recoverable pursuant to

Title IX—the Supreme Court expressly declined to consider the use of Title VII as an analogous statute. *See Franklin*, 503 U.S. at 65 n.4. Accordingly, this court is still bound by the Eleventh Circuit's instruction that, when analyzing Title IX, courts should focus on the structure of Title VI, 42 U.S.C. § 2000d, rather than Title VII. *Franklin*, 911 F.2d at 622. Nevertheless, as it relates to *liability* under Title VI, and for that matter Title IX as well,[16] the Eleventh Circuit established that "'discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI.'" *Holton v. City of Thomasville Sch. Dist.*, 425 F.3d 1325, 1329 n.1 (11th Cir. 2005) (quoting *Gratz v. Bollinger*, 539 U.S. 244, 276 n.23 (2003)). Therefore, to ascertain the "likelihood of success on the merits," the court utilizes the same analysis for Rollins' Equal Protection and Title IX claims—(1) whether Defendants treated similarly situated people disparately and (2) whether gender animus motivated Defendants' disparate treatment.

Rollins claims that Defendants treated Student 1 more favorably than him in violation of the Equal Protection Clause and Title IX. *See* doc. 1-1, at 10-13. To support this discrimination allegation, Rollins contends that both he and Student 1 failed a course, but Defendants allowed Student 1 to remediate her failed course

---

[16] Title IX "was modeled after Title VI of the Civil Rights Act of 1964, which is parallel to Title IX except that it prohibits race discrimination, not sex discrimination, and applies in all programs receiving federal funds, not only in education programs. The two statutes operate in the same manner, conditioning an offer of federal funding on a promise by the recipient not to discriminate . . . ." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998) (internal citations omitted).

and to repeat her first year of dental school. *Id.*; *see also* doc. 4, at 12-18. However, as shown by Defendants, this simplistic contention distorts the similarities and differences between Student 1 and Rollins. Student 1 earned a 66% final failing average in Cardiovascular & Renal Systems—a basic science course. (Ct. Exh. 5). Accordingly, pursuant to the course syllabus and the Academic Guidelines, (Pl. Exh. 11), Student 1 took a "competency" exam and scored a failing 63%. (Ct. Exh. 5). Therefore, Student 1 received a failing overall grade in Cardiovascular & Renal Systems. (Ct. Exh. 2). While Rollins contends that Defendants treated him less favorably than Student 1 by denying him remediation in Dental Anesthesia, Rollins ignores that Defendants afforded him the same opportunities as Student 1 in a basic science class. Specifically, Rollins earned a 53% final average in Gross Anatomy, (Ct. Exh. 5), and, although not technically available to Rollins in the course syllabus since Rollins scored below the 60% cut-off, (D. Exh. 9), the course director nonetheless allowed Rollins to take the "competency" exam, which he scored an 80%, and therefore, received a "C" overall grade in Gross Anatomy. (Ct. Exh. 1); (Ct. Exh. 5). Thus, as it relates to failing basic science courses and the ability to take a "competency" exam, there is no disparate treatment between Rollins and Student 1—in fact, Defendants arguably treated Rollins more favorably by allowing his "competency" exam in Gross Anatomy.

In other words, while Rollins challenges purported disparate treatment as it relates to remediation and/or competency exams, the actual disparate treatment is

Defendants' decision to allow Student 1 to repeat her first year because of her failing grade, whereas Defendants chose to dismiss Rollins.  To explain the decision, Dr. Tilashalski testified that, when considering the global academic picture for each individual student, the APC found that Student 1, unlike Rollins, retained the potential to succeed at the SOD if she repeated her first year.[17]  Even though Student 1 ranked lower in the class, maintained a lower overall GPA, and received more "C" final grades than Rollins, *see* (Ct. Exh. 1, 2, 5), Dr. Tilashalski provided that the APC also found that Rollins failed sixteen individual exams in his first year at the SOD, including all eight exams in Gross Anatomy and the first two exams of Fundamentals I, a class he had previously taken while studying for a masters degree he failed to obtain in oral biology based on his GPA.  *See* (Ct. Exh. 5).  Conversely, according to Dr. Tilashalski, Student 1 failed approximately six exams in her first year.  In this regard, the APC considered whether a student showed deficiencies in a wide range of subject matters or merely a few isolated subjects.  Furthermore, the APC and the Faculty Council heard statements about the students' purported extenuating circumstances.  Student 1 provided that she took her mother to the emergency room the night before the third exam in Cardiovascular & Renal systems, and Rollins provided only that he became engaged during the spring semester.

---

[17] Dr. Tilashalski also testified that he voted to dismiss Student 1 and Rollins, but accepted—as Associate Dean—the APC's majority vote to require repetition for Student 1 and dismissal for Rollins.

Any discrimination case that relies solely on a "comparator" analysis for circumstantial evidence of discrimination[18] requires that the comparators are similarly situated in all relevant respects. *Cf. Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004) ("The comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer."). Based on the evidence currently before the court, the court finds success on the discrimination claim unlikely given the differences between Rollins and Student 1. Namely, the "relevant respects" for an academic dismissal concern the capacity to succeed at the academic institution. The evidence presented provides reasonable extenuating circumstances to excuse Student 1's poor performance and more overall failed exams by Rollins, thereby preventing an acceptable comparator analysis. *See Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999) ("We require that the quantity and quality of comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.").

Furthermore, even if the court assumes Student 1 is a satisfactory comparator, Defendants offer an adequate, gender-neutral justification for Rollins' dismissal—the APC and Dr. Tilashalski decided that Rollins gave dental school his best possible performance throughout his first year and still fell short of the academic standards necessary to continue in the SOD. Given Rollins' sixteen

---

[18] The preliminary injunction hearing revealed no direct evidence of discrimination. *Cf. Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004).

failing exam grades, including all eight in Gross Anatomy, combined with Student 1's extenuating circumstances, the court, without more, cannot make the reasonable inference that the APC and Dr. Tilashalski's justification for their decision is mere pretext to mask some gender-based animus. *Cf. Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1182 (11th Cir. 2010).

Finally, any allegedly gender-based discriminatory treatment between Rollins and Student 1 is substantially minimized by Defendants' decision to dismiss Student 2—a female. *See* (Ct. Exh. 5, 6). Student 2 ranked last in the first year dental school class, but still only failed one course over the year—Cardiovascular & Renal. (Ct. Exh. 3). Based on her overall performance, the APC voted for dismissal and the Faculty Council affirmed the decision. (Ct. Exh. 5, 6). In other words, Defendants treated a female the same as Rollins. *See Jackson v. Mo. Pac. R. Co.*, 803 F.2d 401, 406 (8th Cir. 1986). The existence of a similarly treated comparator in the purportedly favored-class severely diminishes Rollins' likelihood of success on the merits of the discrimination claim.

In short, Rollins offers insufficient evidence of any female that is similar in all relevant respects, and, even if Rollins provides a satisfactory comparator, there is no evidence that Defendants treated Rollins less favorably because of his gender or that Defendants' reasons for the difference in treatment are pretext for gender animus.

## IV.   Conclusion

As Rollins fails to satisfy the first requirement for a preliminary

injunction—substantial likelihood of success on the merits, *see All Care Nursing*, 887 F.2d at 1537—the court finds no need to address the remaining three requirements.  The court's decision here relates solely to the denial of a preliminary injunction based on the evidence presented at this juncture.  While the court finds insufficient evidence to grant the extraordinary remedy of a preliminary injunction forcing Defendants to enroll Rollins in the SOD against their will, this decision has no impact or significance on the actual merits of this litigation.  Rollins is still afforded every right and remedy available to civil litigants including, but not limited to, discovery, a potential jury-trial, and appeal. The court will enter a separate order in accordance with this Memorandum Opinion.

Done the 30th day of July, 2012.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE