FILED
2014 Sep-29  AM 10:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **DOUGLAS LEE ROLLINS, III,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.:  2:12-cv-2458-AKK** |
| | ) | |
| **THE BOARD OF TRUSTEES OF** | ) | |
| **THE UNIVERSITY OF ALABAMA,** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Defendants.** | | |

## MEMORANDUM OPINION

This lawsuit stems from Douglas Lee Rollins, III's dismissal for academic reasons from The University of Alabama at Birmingham School of Dentistry ("SOD") program after his first year. According to Rollins, the SOD should have allowed him to remediate the Dental Anesthesia course he failed or to repeat his first year. Doc. 20. Rollins contends that his dismissal violated his due process rights and that the SOD treated him less favorably than two classmates – an African American female (Comparator One) and a white female (Comparator Two). Consequently, Rollins filed this lawsuit against the Board of Trustees of The University of Alabama ("UAB") and Dean Michael S. Reddy, DMD (collectively "Defendants"), seeking declaratory and injunctive relief for alleged

violations of his due process and equal protection rights under the Fourteenth Amendment and the Constitution of Alabama of 1901, Article I, §§ 1, 6, and 22 (Counts I and II), and, as to UAB solely, for alleged violations of his rights under Title VI of the Civil Rights Act of 1964, and Title IX of the Education Amendments of 1972 (Counts III and IV). The court has for its consideration the parties' cross motions for summary judgment.[1] Docs. 46, 48, 54. For the reasons outlined fully below, Defendants' motions are due to be granted, and Rollins' motion is due to be denied.

## I. <u>SUMMARY JUDGMENT STANDARD OF REVIEW</u>

Under Federal Rule of Civil Procedure 56 (c), summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c). "Rule 56 (c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party

---

[1] Rollins also filed a Motion in the Spirit of Rule 56(d), doc. 40, which the court **DENIES** because it is untimely, *see* Fed. R. Civ. P. 34(b)(2)(A), *Thomas v. Pacificorp*, 324 F.3d 1176, 1179 (10th Cir. 2003), and *Boral Indus., Inc. v. Cont'l Cas. Co.*, 144 F. App'x 36, 38 (11th Cir. 2005), and also because Rollins failed to establish that he is entitled to the relief he seeks, *see Barfield v. Brierton*, 883 F.2d 923, 932 (11th Cir. 1989). Consequently, Rollins' Motion to Substitute an Exhibit Page, doc. 45, is **MOOT**.

will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986). The moving party bears the initial burden of proving the absence of a

genuine issue of material fact. *Id*. at 323. The burden then shifts to the nonmoving

party, who is required to "go beyond the pleadings" to establish that there is a

"genuine issue for trial." *Id*. at 324 (citation and internal quotation marks omitted).

A dispute about a material fact is genuine "if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby,

Inc.*, 477 U.S. 242, 248 (1986). The court must construe the evidence and all

reasonable inferences arising from it in the light most favorable to the non-moving

party. *Id*. However, "mere conclusions and unsupported factual allegations are

legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432

F.3d 1321, 1326 (11th Cir. 2005) (*per curiam*) (citing *Bald Mountain Park, Ltd. v.

Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)).

## II. FACTUAL BACKGROUND

UAB admitted Rollins to the SOD in the fall of 2011 and dismissed him

before his second year for academic reasons. Doc. 50-1 at 22. The dispute in this

case hinges, in part, on the SOD's practice of allowing students who fail a course a

chance to remediate and hopefully obtain a passing grade. According to Rollins,

the SOD's policies provide for remediation as an automatic right for all courses –

3

a contention that the SOD disputes.

A.     **The Academic Guidelines, Academic Performance Committee, and Faculty Council**

The Academic Guidelines (the "Guidelines") provide two mechanisms for a student to challenge a grade, and, if necessary, their proposed dismissal from the SOD.  To appeal a grade,[2] a student must (1) attempt to resolve the disagreement with the course director, (2) file a written appeal to the chair of the department, and, if denied, (3) submit a final appeal to the Associate Dean. Doc. 50-2 at 3.  A student must base an appeal on one of the following grounds:

> 1.  The grading was not in accordance with the published course grading policy; 2. Inconsistencies were made in the application of evaluation standards among students; 3. A procedural error occurred in establishing the grade (i.e. mathematical error); 4. The grading was arbitrary or capricious; or 5. The grading was affected by considerations of basis of race, disability, gender, ethnicity, or religious affiliation.

*Id.*

The SOD utilizes a separate process to address overall academic performance issues.  In pertinent part, the Guidelines state:

---

[2] The SOD uses the following grading scale: "A" (mastery of course), "B" (strong performance), "C" (acceptable performance), and "F" (unacceptable performance, poor understanding, and lack or competency). Doc. 50-2 at 1, 4. Students may also earn "I" (a temporary grade assigned at the course director's discretion under extraordinary circumstances), "G" (exemption), and "P" (pass). *Id.* at 4, 5.

4

ACADEMIC STATUS

The Academic Performance Committee [APC][3] is charged with monitoring and assessing the academic status of students in the DMD program. The Associate Dean of Academic Affairs (Associate Dean) serves as the Chair of the APC . . . . The APC will review grades and other material pertinent to student progress and evaluate the information as it relates to established school policy. Based on this information, the APC will make recommendations to the Associate Dean regarding promotion, probationary status, repetition, remediation, and dismissal. The final decision of academic status rests with the Associate Dean. . . . [A]cademic decisions will be governed by the version of the Academic Guidelines in place at the time of the decision.

It should be noted that the APC reviews materials, in addition to grades, when determining promotion recommendations for students. Grades, professionalism including ethics, academic interactions, performance on the National Dental Board Examination, among other relevant indicators are considered in the evaluation process.

Promotion/Graduation

Students with satisfactory professional conduct, no standing course failure, and a yearly and cumulative grade point average [] of 2.0 or greater may be recommended for promotion to the succeeding term . . . .

. . .

Repetition/Dismissal

A recommendation for repetition of the academic year will be made if the APC determines that a student has the potential to complete the DMD program, but has not met the criteria to justify promotion to the next class level . . . .

A recommendation for academic dismissal may be made if sufficient evidence exists to indicate that a student will not be able to correct

---

[3] During the relevant period in this case, the members of the APC included Drs. Ken Tilashalski (chair), Walter Bell, Augusto Robles, John Coke, Maureen Pezzementi, Paul Eleazer, Merrie Ramp (Rollins' advisor), and Sonya Mitchell. Doc. 53-8 at 1.

past academic deficiencies within a reasonable time. Once a student
has been dismissed for academic reasons or ethics violations, future
readmission to the SOD will not be considered.

                                        . . .

[Any failing grade] may justify the APC's recommendation for
repetition or dismissal. . . .

Doc. 50-2 at 1–2. Basically, if a student receives a failing grade, "the APC will

make recommendations to the Associate Dean as to whether to allow remediation

of the failed course o[r] if more severe academic action is justified (repetition or

dismissal)." *Id.* at 4. While "[a]ny failing course grade must be remediated,"

however, "[s]ome courses, [such as the large preclinical/clinical courses and most

basic science courses], may not offer remediation, as determined by the course

director and Associate Dean." *Id.* at 5. Instead, students failing a basic science

course may be offered an optional comprehensive examination in lieu of

remediation "since the systems courses build on previously presented material."

Doc. 51-9 at 6; *see also* doc. 50-2 at 5. Alternatively, "if no remediation is offered,

the APC may allow a student to remediate a course while repeating the year." Doc.

50-2 at 5. The "APC and Associate Dean may consider other methods of

remediation as well." *Id.* Finally, the APC may also recommend the dismissal of a

student. *Id.*

        SOD students can appeal the APC's recommendation to the Faculty

Council,[4] which "[f]unction[s] as the executive committee of the faculty and as the advisory board to the Dean on . . . matters pertaining to academic and administrative policies." Doc. 52-12 at 8; *see also* doc. 50-2 at 3. "If a student believes there is reasonable cause to request an appeal," the student must submit the request in writing "along with a rationale . . . for the request." Doc. 50-2 at 3. In accordance with the Guidelines, the Faculty Council will conduct a hearing at which the Associate Dean presents the "rationale for the recommendations and decision relating to the student's academic status" and the student presents her rationale in support of a reversal of the decision. *Id*. The Faculty Council's majority vote in support of the Associate Dean's decision "will end the appeal process at the SOD level." *Id*. at 4. However, a majority vote in favor of the student "will be followed by discussion and recommendations by the Council to the Dean of the SOD" and the Dean "may implement or modify the Faculty Council's recommendation." *Id*.

## B.    Rollins' Academic Performance

During the fall semester, Rollins earned two "A"s (Dentistry and Culture,

---

[4] During the relevant period, the Faculty Council consisted of Drs. John Ruby (Chair), Peter Waite, Dan Givan, Sonya Mitchell, K. David Stillwell, Patrick Louis (Professor in the Department of Oral and Maxillofacial Surgery and course director for Dental Anesthesia), and Laura Cotlin. Docs. 52-12 at 8; 51-3 at 3.

and Evidence-Based Dentistry), seven "B"s (Fundamentals I and II, Ethics in Dentistry, Dental Radiology, Oral Microbiology/Immunology, Entry Level Clinical Skills, and Dental Anatomy), and two pass grades (Communications and Cultural Competency). Doc. 52-16 at 7. Rollins finished the semester with a 3.17 GPA and ranked 51 out of 56 in his first year class. *Id.*; doc. 53-4 at 2. The spring semester proved more challenging, with Rollins earning four "B"s (Case Based Education, Medical Emergencies, Periodontology, and PCD: Operative), three "C"s (Gross Anatomy, Neuroanatomy, and Cardiovascular and Renal Systems), one pass (High Stakes Assessments), and one "F" (Dental Anesthesia). Doc. 53-26 at 3. Rollins finished the semester with a GPA of 2.34, a cumulative GPA of 2.72, and a class rank of 54 out of 56. *Id.*; doc. 53-26 at 3.

Gross Anatomy and Dental Anesthesia caused Rollins particular difficulty. In Gross Anatomy, a basic science course in which the SOD "instituted a 'retest'" or competency examination for students who failed "within a certain grade range," doc. 51-9 at 6, Rollins failed all the graded assessments and finished the course with a average of 53.3%, doc. 53-3 at 5; 53-26 at 3. Although the syllabus stated that only "[s]tudents who earn a grade of 60-69 . . . will be allowed to take a competency exam . . . ," doc. 56-34 at 1, Dr. Steven Zehren, the course director, made an exception for Rollins because "a precedent had been set in 2009," when

8

seven students with averages below 60% were allowed to take the examination, and he "thought there would be little or no opportunity for [Rollins] to make up the course that summer," doc. 56-35 at 7; *see also* docs. 52-23 at 8; 50-4 at 3. Rollins scored 80% on the comprehensive competency exam, which raised his final grade to a "C." Doc. 50-5 at 58.

In Dental Anesthesia, Rollins failed both examinations, and finished the course with a weighted grade of 67.46%.[5] Docs. 51-3 at 9, 69; 53-35. Because Dr. Louis followed a practice of scaling a grade of 69.1 or higher  to a "C," Rollins failed the class by approximately 1.64 points. Doc. 51-3 at 14, 44. To make matters worse for Rollins, in non-basic science classes like Dental Anesthesia, the SOD contends that remediation "is not a prerogative" and "is a determination by the associate dean of academic affairs after consultation with the APC." Doc. 51-9 at 6.

On June 8, 2012, three months after the final examination, Dr. Louis reported Rollins' final grade to Dr. Tilashalski and posted the grades. Docs. 53-15 at 8.Thereafter, Rollins met with Drs. Louis and Tilashalski to discuss his grade

---

[5] Rollins maintains that "[t]here are six different numbers [ranging from 67.24 to 68] which purport to reflect [his] final numerical grade in [Dental Anesthesia]." Doc. 55-1 at 3. Regardless of which number the court uses, Rollins still fell below the 69.1 cut-off Dr. Louis used for a passing grade.

and academic status, attributed his failing grade to his decision to get engaged during the semester,  and asked about remediation. Docs. 51-10 at 3, 6–7; 50-6 at 71. Consistent with SOD policy, Dr. Tilashalski informed Rollins "when the APC [was] going to meet," "what [the] potential consequences could be as a result of that meeting," and "the appeal process both for the grade and for any potential academic status." Doc. 50-6 at 71; *see also* doc. 51-10 at 5.

###    C.    Academic Performance of Alleged Comparators

Rollins identifies two classmates, who also experienced difficulties in the spring semester, as comparators. The Comparators failed Cardiovascular and Renal Systems, and also failed the comprehensive competency exam offered as remediation. Doc. 53-8 at 1. Comparator Two, a white female, whose other grades included three "B"s (Case-Based Education, Medical Emergencies, and PCD: Operative), four "C"s (Dental Anesthesia, Gross Anatomy, Periodontology, and Neuroanatomy), and one pass (High Stakes Assessments), finished with a 2.10 semester GPA, a 2.55 cumulative GPA, and a class rank of 55 out of 56. Docs. 52-12 at 21; 53-1 at 2. Comparator One, an African American female, finished the semester ranked last in the D1 class, and her other grades consisted of a "B" (PCD: Operative), six "C"s (Case-Based Education, Dental Anesthesia, Medical Emergencies, Periodontology, Gross Anatomy, and Neuroanatomy), and one pass

(High Stakes Assessments), for a semester GPA of 1.95, and a cumulative GPA of 2.38. Docs. 52-13 at 16; 53-1 at 2. In other words, at the end of the first year, the students at the bottom of the class were Rollins (#54), Comparator Two (#55), and Comparator One (#56).

> ### D.    The APC's Review of Rollins, and Comparators One and Two's Academic Status

Rollins and Comparators One and Two's performances prompted the APC to review their academic standing. Ultimately, the APC voted to dismiss Rollins and Comparator One, and to allow Comparator Two to repeat the D1 year. Doc. 53-8 at 1–2. Prior to the vote, Dr. Tilashalski, in his capacity as chair, provided the committee with preliminary data that outlined details about the three students' academic performance. Doc. 52-23 at 2, 5. Dr. Tilashalski indicated that Rollins failed Cardiovascular and Renal Systems,[6] Dental Anesthesia (adding that he could not "recall the last time that a student has failed this course (if ever)"), and Gross Anatomy with a 53.3% average (but noted that Rollins "successfully passed the retest," which the instructor allowed Rollins to take even though the syllabus

---

[6] Rollins actually passed the class with a 72%. Dr. Tilashalski later explained that the information regarding Rollins failing Cardiovascular and Renal Systems "was an interim e-mail in the process, and information that was given to the APC in the discussion during the [APC] meeting certainly did not have that brought out." Doc. 50-3 at 16; *see also* doc. 52-23 at 7. Dr. Tilashalski corrected the error before the APC meeting. Doc. 53-1 at 1.

"indicate[d] that a retest will only be offered to students that have final course grades between 60-69%"). *Id.* at 1–2, 5–6. Dr. Tilashalski subsequently provided the APC updated information that reported Rollins' final grades as: 67.5% in Dental Anesthesia, 53.3% in Gross Anatomy (ultimately, 80% after the comprehensive examination), "B" in Fundamentals I (although he pointed out that Rollins failed the first two examinations even though Rollins took the same course previously while pursuing a master's degree), 72% in Cardiovascular and Renal Systems, and "B" in Medical Emergencies (although he reported that Rollins failed the final examination and earned a "B" primarily because of a group project). Doc. 53-1 at 2. When the APC convened on June 20, 2012, doc. 56-8 at 1, after the committee members reviewed and discussed Rollins' academic performance, four members voted in favor of dismissal and two voted for repetition, doc. 50-3 at 44–45. Dr. Ramp, Rollins' advisor, abstained. *Id.*

Dr. Tilashalski informed Rollins the following day of the APC's decision and relayed the options for an appeal. Docs. 50-5 at 65; 52-7 at 10. As a result, Rollins devised a two-prong attack that consisted of appealing both the APC decision and his Dental Anesthesia grade. Consequently, a few days later, Rollins notified Dr. Louis of his intent to appeal his grade in Dental Anesthesia. Doc. 53-

22 at 5.  Because Rollins had completed step one[7] when he met with Dr. Louis shortly before the June 8 posting of grades, *see* doc. 51-10 at 6–8, 16, Rollins proceeded to step two[8] and filed a written appeal with Dr. Waite[9], in which he alleged that "[i]nconsistencies were made in application of evaluation standards among students," and that "the grading was arbitrary," doc. 53-22 at 5. In support of his appeal, Rollins presented a paper entitled "Clinical Complications of Dental Anesthesia," doc. 50-1 at 29, presumably to demonstrate his competency in the subject matter.[10] On June 30, 2012, Dr. Waite denied Rollins' grade appeal. Doc. 51-10 at 3. Rollins did not advance his appeal to step three.[11] Docs. 50-3 at 36; 50-5 at 79–80.

Rollins separately challenged the APC's decision to dismiss him by filing an appeal to the Faculty Council on June 28, which he amended on July 3. Docs.

---

[7] The first step of the grade appeal process is for a student who wishes to challenge a grade to attempt to resolve the issue with the course director. Doc. 50-2 at 3.

[8] The second step of the grade appeal process is for the aggrieved student to submit a written appeal to the chair of the department. Doc. 50-2 at 3.

[9] Rollins also filed another appeal with Dr. Louis.  Doc. 53-22 at 5.  Dr. Louis previously denied Rollins' appeal on June 11, doc. 51-10 at 16, and also denied Rollins' second appeal, doc. 53-22 at 16.

[10] Rollins submitted the paper hoping that it "could salvage the 2.5 points necessary to pass the course before grades [were] due at week's end." Doc. 51-10 at 8. Rollins also volunteered to help Dr. Louis with continuing education classes. *Id*.

[11] The third and final step of the grade appeal process for a student to make an appeal to the associate dean. Doc. 50-2 at 3.

53-23; 53-24 at 1; 50-1 at 28; 60-61; 51-1 at 60; 52-7 at 1–9. When the Faculty

Council met on July 3 to discuss Rollins' appeal, Dr. Tilashalski comprehensively

summarized Rollins' academic record by noting Rollins' grades and the specific

circumstances that led to a passing grade in some classes. Doc. 53-25 at 1. Dr.

Tilashalski also pointed out that although Rollins earned a "B" in Fundamentals I,

Rollins failed the first two examinations even though Rollins took the same course

while pursuing his master's degree in oral biology. Docs. 53-25 at 1; 56-39 at 25–

27. Next, regarding Gross Anatomy, Dr. Tilashalski reported:

> Gross Anatomy was really the disturbing thing. Got a 53.3 percent
> course average. Failed every single assessment in the class . . . . His
> performance went down towards the end of the course. His last lab
> exam was 42 percent, his last written exam was 44 percent. [Rollins]
> attended all of the labs and extra help sessions. I mean, this is a
> student that is going. I mean, we can't say he didn't do well because
> he wasn't trying, he was there. [Rollins] expresses genuine interest in
> anatomy and said he wanted to do well in the course. He told me
> during my initial talk with him after his poor performance on the first
> quiz. And then it went down, it didn't get better. Which was really a
> question whether he could do it. Steve [Zehren] allowed [Rollins] to
> take the retest even though he didn't qualify for it. [Zehren's] syllabus
> says quite clearly, to qualify for the retest you have to get between a
> 60-6[9]. So he really should have failed gross anatomy, he shouldn't
> have been qualified for the retest. He did pass the retest with an 80
> percent, but never should have been allowed to take it. Should have
> been a straight failure with those numbers. Now the retest was meant
> for somebody that had a bad day. Oh, I just barely failed a course
> because, you know, I did have a bad day or, you know, I struggled a
> little bit. It is not I struggle[d] on every single assessment. You know,
> a 42 percent, boy! And so while he passed gross anatomy, we really

look at this as really poor performance.

Doc. 56-39 at 26. In summary, Dr. Tilashalski informed the Faculty Council that Rollins "failed [Dental] Anesthesia, should have failed gross anatomy, and came in and was – performed poorly on a course he already had the previous year." Doc. 56-39 at 28. According to Dr. Tilashalski, the APC "looked at that [record] as somebody that . . . we are not sure can make it through." *Id*. Dr. Louis, who was a member of the Faculty Council, added after Dr. Tilashalski's presentation that he "curved the grades [in Dental Anesthesia], . . . and [Rollins] still didn't meet the criteria [and] wasn't on the borderline." Doc. 56-39 at 35–36; *see also* doc. 56-50 at 1. Ultimately, after discussing Rollins' appeal, the Faculty Council voted unanimously to affirm the APC's decision to dismiss Rollins.[12] Doc. 52-9 at 16–18.

## III. ANALYSIS

The parties have filed cross motions for summary judgment. In a nutshell, Rollins alleges that he is due summary judgment because Defendants violated his equal protection and due process rights by failing to follow the Guidelines and the course syllabus when they denied his request for remediation in Dental

---

[12] The Faculty Council also voted unanimously to uphold the decision to allow Comparator Two to repeat her D1 year and an overwhelming majority voted to affirm the decision to dismiss Comparator One, with one abstention. Doc. 52-9 at 16–18.

Anesthesia, and that UAB violated his rights under Titles VI and IX by treating

him less favorably than Comparators One and Two. Doc. 20. Defendants raise

multiple arguments in favor of their motions, including that they are immune

under the Alabama and United States Constitutions to Rollins' claims arising from

alleged due process and equal protection rights violations. This opinion is divided

into three parts. First, the court will analyze the immunity defenses in Section A.

Second, the court will analyze the contentions regarding the substantive and

procedural due process claims in Section B. Finally, the court will analyze the

equal protection and Titles VI and IX claims in Section C.

A.     **Immunity**

In Counts I and II, Rollins asserts equal protection and due process claims

for alleged violations of the United States and Alabama Constitutions. Defendants

contend that they are entitled to immunity under the Eleventh Amendment and

Alabama Constitution. As to the alleged violations of the United States

Constitution, which Rollins is bringing pursuant to 42 U.S.C. § 1983, because "an

unconsenting state is immune from lawsuits brought in federal court by the state's

own citizens," *Carr v. City of Florence, Ala.*, 916 F.2d 1521, 1524 (11th Cir.

1990) (citing *Hans v. Louisiana*, 134 U.S. 1 (1980)), UAB is immune from § 1983

liability as an instrumentality of the state, *see Harden v. Adams*, 760 F.2d 1158,

1164 (11th Cir. 1985) (citation omitted); *Cox v. Bd. of Trs. of Univ. of Ala.*, 161

Ala. 639, 648 (Ala. 1909). Likewise, UAB is immune under the Alabama

Constitution, which states, in relevant part, that the "State of Alabama shall never

be made a defendant in any court of law or equity." Ala. Const. Art. I, § 14;

*Hutchinson v. Bd. of Trs. of Univ. of Ala.*, 256 So. 2d 281, 283 (Ala. 1971). The

Alabama Supreme Court has described this immunity as "almost invincible," *Ala.*

*State Docks v. Saxon*, 631 So. 2d 943, 946 (Ala. 1994), and one that bars "almost

every conceivable type of case," *Hutchinson*, 256 So. 2d at 282. Therefore,

summary judgment is due to be granted as to Rollins' claims against UAB for

alleged violations of the Alabama and United States Constitutions. However,

Rollins is also pursuing a claim for injunctive relief against UAB. Moreover, he is

only pursuing a claim against Dr. Reddy in Dr. Reddy's official capacity for

prospective declaratory and injunctive relief, doc. 61 at 16 n.6, and, as such, Dr.

Reddy is not entitled to Eleventh Amendment immunity in his official capacity for

the alleged violations of the United States Constitution, *see Verizon Md., Inc. v.*

*Pub. Serv. Comm'n of Md.*, 535 U.S 635, 645–46 (2002) (citations omitted), or

immunity under the Alabama Constitution, *see Haley v. Barbour Cnty.*, 885 So. 2d

783, 788 (Ala. 2004) (instructing that an action against a state official is only

against the state if it seeks monetary relief) (citations omitted). Consequently, the

court will address the merits of the due process and equal protection claims against both Defendants.

### B.      Due Process claims under the Fourteenth Amendment

The court turns now to Defendants' substantive arguments as to Counts I and II. As an initial matter, the court notes that, based on *Hamil v. Vertress*, No. Civ.A.98-D-508-N, 2001 WL 135716 at *7 (M.D. Ala. Jan. 10, 2001), Dr. Reddy contends that Rollins cannot establish that he has a constitutionally-protected right to continued enrollment at UAB. The court will assume for this opinion that Rollins has such an interest because "no tenet of constitutional law is more clearly established than the rule that a property interest in continued enrollment in a state school is an important entitlement protected by the Due Process Clause of the Fourteenth Amendment." *Barnes v. Zaccari*, 669 F.3d 1295, 1305 (11th Cir. 2012) (citation omitted); *see also Bd. of Curators of the Univ. of Mo. v. Horowitz*, 435 U.S. 78, 84–85 (1978).

#### 1. Procedural Due Process

Generally, "'[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation.'" *Horowitz*, 435 U.S. at 86 (quoting *Cafeteria Workers v. McElroy*, 367 U.S. 886,

895 (1961)). This "need for flexibility is well illustrated by the significant difference between the failure of a student to meet academic standards and the violation by a student of valid rules of conduct. This difference calls for far less stringent procedural requirements in the case of an academic dismissal." *Id.* As such, "[a]cademic evaluations of a student, in contrast to disciplinary determinations, bear little resemblance to the judicial and administrative fact-finding proceedings to which we have traditionally attached a full-hearing requirement." *Id.* at 89. "Like the decision of an individual professor as to the proper grade for a student in his course, the determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking." *Id.* at 90. Therefore, although the decisionmaking process must be "careful and deliberate," *id.* at 85–87, "[f]ormal hearings are not required in academic dismissals," *Haberle v. Univ. of Ala. at Birmingham*, 803 F.2d 1536, 1539 (11th Cir. 1986).

With these general principles in mind, the court turns now to Rollins' claims of alleged procedural due process violations.

        a.    <u>Alleged violation of APC meeting attendance policy</u>

The first alleged procedural flaw is based on Dr. Louis' failure to attend the

APC meeting or submit a letter in his absence. Rollins' contention is based on the

following testimony from Dr. Mitchell:

> My understanding of how the [APC] runs is that [Dr. Louis] would
> need to make some sort of written communication to Dr. Tilashalski
> and the APC, because he may have been out of town. . . .  The other
> thing would be, if a letter was not given, I would imagine that [Dr.
> Louis] would have had a conversation with Dr. Tilashalski regarding
> it; but then still, typically some sort of written letter ensues after that,
> even if it may not have been ready, maybe, for the APC.

Doc. 56-30 at 8. Unfortunately, the Guidelines do not support Dr. Mitchell's

testimony. *See* doc. 50-2 at 1–5. Dr. Mitchell is referring instead to Dr.

Tilashalski's standard practice of inviting instructors to attend the APC meetings,

"especially if somebody has a student with a failing score." Doc. 50-3 at 44. This

practice does not help Rollins, however, because the instructors have no obligation

to attend. *Id.* Because SOD Guidelines and Dr. Tilashalski did not require Dr.

Louis to appear in person or to submit a written report, Rollins has failed to

establish a procedural due process violation related to Dr. Louis' absence from the

APC meeting.

        b.    <u>Alleged false information to the APC</u>

Rollins asserts next that Dr. Tilashalski provided inaccurate and damaging

documents concerning his academic performance to the APC. First, Rollins

contends that Dr. Tilashalski provided the APC a misleading initial impression by

only giving it a partial list of grades that failed to include the classes in which

Rollins earned a "B." *See* doc. 52-23 at 2. This contention is unavailing because

when Dr. Tilashalski emailed the APC a spreadsheet of Rollins' grades on June 7,

he explained that it was "incomplete at this time as grades aren't due until Friday,

June 15," and that there was "[m]ore to come when all grades are in." *Id.* at 1

(emphasis added). The initial spreadsheet indeed did not include courses in which

Rollins earned a "B" and indicated only that Rollins' spring semester grades were

one "F," three "C"s, and one passing grade. *Id.* at 2. However, the next day, Dr.

Tilashalski sent the APC an "updated spreadsheet . . . [with] some 'holes' as

grades are not due until next Friday," but which included the "B" Rollins earned in

Medical Emergencies. *Id.* at 5–7. Based on this evidence, it is clear that Dr.

Tilashalski violated no SOD procedures and that his initial report did not prejudice

Rollins because Dr. Tilashalski informed the APC that the spreadsheet was

incomplete, frequently updated it and, ultimately, presented a chart to the APC that

accurately displayed Rollins' grades in their entirety. Doc. 56-19 at 1. While

Rollins obviously would have preferred for Dr. Tilashalski to only present the

completed transcript, there is nothing here to establish that Dr. Tilashalski acted

imprudently or that he violated Rollins' constitutional rights.

      Second, Rollins contends that Dr. Tilashalski erroneously informed the APC

that Rollins failed Cardiovascular and Renal Systems.[13] However, Rollins ignores

that the same email contained a spreadsheet that accurately listed his grade as 72%

or "C." Doc. 52-23 at 7. Moreover, the minutes from the APC meeting correctly

represented the Cardiovascular and Renal Systems grade. Doc. 56-8 at 2. In other

words, the APC reached a decision based on the correct information.

Finally, focusing solely on one portion of Dr. Tilashalski's correspondence,

Rollins contends that Dr. Tilashalski informed the APC incorrectly that Rollins

failed Gross Anatomy and failed to qualify for the Gross Anatomy retest which the

instructor did in fact allow Rollins to take. The full text of Dr. Tilashalski's email

stated that Rollins

> [f]ailed Gross Anatomy with a 53.3% average but successfully passed
> the retest.  The course syllabus in Gross Anatomy indicates that a
> retest will only be offered to students that have final course grades
> between 60-69%. I have emailed the course director for clarification
> of why Lee was even offered the retest; it seems like he should have
> failed Gross Anatomy as well.

Doc. 52-23 at 5. Thereafter, Dr. Tilashalski shared that Dr. Zehren offered the

retest to Rollins "because a precedent was set in 2009," when seven students with

final averages below 60% were allowed to take the competency examination, and

he "thought there would be little or no opportunity for Lee Rollins to make-up

---

[13] The email stated: "After the fall term (and prior to the failure in [Cardiovascular and Renal Systems]), Lee [ranked] 51–56 students." Doc. 52-23 at 5.

gross anatomy th[at] summer . . ." *Id.* Significantly, the minutes from the APC meeting reflected this same information. Doc. 56-8 at 2. Therefore, Rollins has failed to show that Dr. Tilashalski violated his rights by providing false information to the APC.

c.   <u>Alleged false information to the Faculty Council</u>

Rollins contends next that Dr. Tilashalski failed to follow a careful and deliberate standard during the Faculty Council proceedings.  As his first example, Rollins claims that Dr. Tilashalski reported that Rollins failed Gross Anatomy, but did not provide information about Dr. Zehren's rationale for allowing Rollins to take the competency test. This contention is unavailing because Dr. Tilashalski included the email from Dr. Zehren in the packet of materials he distributed to the Faculty Council. *See* doc. 53-35 at 1. In fact, Dr. Ramp referenced the email when she advocated for Rollins' retention: "The email that Lee referred to from Doctor Ze[hren], you have a copy of it in your packet, if gross anatomy is of concern in review, which is one of the two courses that I believe have been brought to your attention." Doc. 56-41 at 4; *see also* docs. 56-8 at 2; 53-3 at 4. Put simply, the record belies Rollins' contention.

To the extent that Rollins takes issue also with Dr. Tilashalski's position

23

that Dr. Zehren should not have allowed Rollins to take the retest,[14] this contention

also fails because the Guidelines permitted Dr. Tilashalski to present his

viewpoint.  *See* doc. 50-2 at 4 (explaining that the Faculty Council "shall meet . . .

where discussion shall take place . . . ."). In fact, as chair of the APC, the

Guidelines charged Dr. Tilashalski with presenting "the rationale for the

recommendations and decision [from the APC] relating to the student's academic

status." *Id.* at 3. Moreover, it is clear from the minutes that Rollins' performance

in Gross Anatomy factored into the APC's decision:

> [Rollins] also earned "C" in Gross Anatomy (initially failed the class
> with a 53.3% having failed all 8 assessments in the course.
> According to Dr. Zehren, the course director, Lee's performance went
> down toward the end of the course, as his last lab exam was a 42%
> and his last written exam was a 44%.  Lee did attend all of the labs
> and extra help sessions, and indicated to the course director that he
> wanted to do well in the course during an initial talk after his poor
> performance on the first quiz.  Dr. Zehren allowed him to take the
> comprehensive competency exam even though his overall mean
> average fell below the cut-off point of 60%, Lee passed the exam with
> a 80.0%).

---

[14] According to Dr. Tilashalski,

> Steven Ze[hren] allowed [Rollins] to take the retest even though he didn't qualify
> for it. His syllabus says quite clearly, to qualify for the retest you have to get
> between a 60 and 65. So he really should have failed gross anatomy, he shouldn't
> have been qualified for the retest. He did pass the retest with an 80 percent, but
> never should have been allowed to take it. Should have been a straight failure with
> those numbers.

Doc. 56-39 at 26.

Doc. 56-8 at 2; *see also* doc. 50-2 at 3. To that end, Dr. Tilashalski also reported to the Faculty Council that Rollins "got some Bs," failed Dental Anesthesia and received the "only F in the course," scored 65% on the final examination in Medical Emergency "but ended up with a B because of a class project," and that all of these factors indicate "really poor performance." Doc. 56-39 at 25–26. Based on the evidence, it is evident that Dr. Tilashalski focused on Rollins' academic performance as an indicator of Rollins' ability to withstand the rigors of the SOD curriculum. Therefore, the Faculty Council's evaluation of Rollins was not procedurally flawed.

As his second example of an alleged procedural flaw at the Faculty Council meeting, Rollins points to Dr. Tilashalski's comment that he suspected that someone else drafted Rollins' appeal and that Rollins plagiarized the paper he wrote in support of his grade appeal in Dental Anesthesia. The relevant exchange is as follows:

> Dr. Waite:  I think someone else is writing [t]he appeal here.
>
> Dr. Tilashalski:  Oh, I am sure.
>
> Dr. Waite:  This is a very well written appeal.

Doc. 56-39 at 28. Regarding the Dental Anesthesia paper, Dr. Tilashalski commented that a possibility existed that Rollins plagiarized the paper based on a

score of 33 on the plagiarism detection software:

> [a] high percentage would probably be anything over 25 percent.  So you know, we are in the high percentage.  If you – Turnitin actually highlights the places they thought were other text. And if you look at the page two, I mean there is a lot of things, some of these that didn't pick up, you know there is a word stitch here or there, so there is a dash in the original text that didn't pick it up, but it was really the whole sentence. You look at page three, basically a whole paragraph, page four, tons. I mean, I would look at this, if a student turned this into me I would put him up for ethics charges for plagiarism.

*Id.* at 30–31. Because Drs. Waite and Tilashalski had observed first hand Rollins' academic abilities, the court declines to question their professional evaluation of the contents and format of Rollins' appeal. *See Horowitz*, 435 U.S. at 90. Likewise, the court is confounded by Rollins' apparent belief that it is acceptable to submit an academic paper to prove his proficiency in a subject he failed, and yet contend that it is unreasonable to subject the paper to scrutiny. The court rejects Rollins' contention because Dr. Tilashalski raised an important issue regarding Rollins' integrity and presented objective data to support his supposition. The discussion was particularly pertinent because another member of the Faculty Council, Dr. Waite, expressed additional concern because Rollins was unable to answer questions about the substance of the paper. Doc. 56-41 at 13–14, 28. Ultimately, because the Faculty Council questioned Rollins about the paper at the meeting it convened to address Rollins' appeal and were in the best position to

assess Rollins' credibility, the court finds no reason to question Dr. Tilashalski's or the Faculty Council's academic judgment.[15] *See Haberle*, 803 F.2d at 1539. After all, "[c]ourts are particularly ill-equipped to evaluate academic performance." *Horowitz*, 435 U.S. at 956.

d.    Alleged improper consideration of pre-SOD grades

Rollins asserts also that the APC improperly presented to the Faculty Council his pre-SOD grades. *See* doc. 56-41 at 17–22. Under the Guidelines, the APC had the authority to "review grades and other materials pertinent to school progress and evaluate the information as it relates to established school policy," and review "material, in addition to grades, when determining promotion recommendations for students." Doc. 50-2 at 1 (emphasis added). Consistent with the Guidelines, reviewing prior academic history aids a committee in assessing a student's overall ability to succeed in a program, and qualifies as "other materials." *Id*. Additionally, because the Faculty Council's "charge is to see if there was any violation or if there was anything that would make [the Faculty Council] think that [the APC decision] was not an appropriate thing to do," doc.

---

[15] Rollins apparently believes that the SOD should have referred the plagiarism concern to the ethics council instead. *See* doc. 51-1 at 16. As Dr. Ruby explained, there was no need for such a step because the Faculty Council only considered the paper as part of their review of the APC's decision, the paper was not authorized for remediation, "wouldn't be a document that would be used to determine whether there would be remediation," and would not result in a grade on Rollins' transcript. *Id*. at 51-1 at 60–61; doc. 56-39 at 28–30.

56-41 at 38, to conduct an independent review, at a minimum, the Faculty Council must review the same materials as the APC. Moreover, and significantly, the APC and Faculty Council had a particular interest in Rollins' graduate school performance in Fundamentals I because Rollins repeated the course in dental school and still failed the first two exams. This is relevant information pertaining to Rollins' academic performance that the Faculty Council had the authority to review, and, as such, Defendants did not infringe on Rollins' constitutional rights.

          e.     <u>Alleged withholding of information</u>

Rollins asserts next that the Faculty Council withheld favorable information submitted by Dr. Ramp regarding her belief about Rollins' readiness to progress to the second year. *See* doc. 61 at 8–9. This contention is belied by the evidence showing that Dr. Ramp testified on Rollins' behalf at the Faculty Council meeting. Among other things, Dr. Ramp advocated for Rollins' retention because of Rollins' first semester performance, and described Rollins as a determined and persistent self-starter, someone who seeks and takes advice, and possessing an ideal character. Doc. 56-41 at 5-7. Put simply, contrary to Rollins' contention, the Faculty Council received Dr. Ramp's endorsement of Rollins' abilities first hand.

          f.     <u>Alleged deprivation of right to exhaust grade appeal</u>

Rollins also contends that the APC recommended his dismissal before he

completed his grade appeal. In actuality, Rollins waited until <u>after</u> the APC

recommended his dismissal to advance to step two of his grade appeal. Docs. 53-

22 at 16; 51-10 at 2–9. Rollins initiated step one earlier beginning on June 4 when

he met with Dr. Louis about his grade, doc. 51-10 at 6–8, and received Dr. Louis'

answer on June 11, *id.* at 16 (Dr. Louis' email that he "must follow the

remediation guidelines" and that "the F will have to remain on [Rollins']

transcript"). Despite Dr. Louis' answer, Rollins waited until the APC's decision on

June 27 to initiate step two of his grade appeal.[16] Docs. 53-22 at 16; 51-10 at 2–9.

Significantly, Rollins chose to forgo exhausting his grade appeal by failing to

initiate step three. Instead, Rollins filed an appeal to the Faculty Council on June

28 challenging the APC's recommendation of his dismissal,[17] doc. 53-23, which is

a separate and independent procedure from the grade appeal. *See* doc. 50-2 at 3–4

(describing distinct processes for grade appeal and academic status appeal). To the

extent Rollins is contending that the APC should have waited to convene until

after he had exhausted his grade appeal, this contention misses the mark because

the APC is a separate process that does not preclude a grade appeal. In short,

---

[16] Rollins filed a second appeal with Dr. Louis on June 27 even though he had already initiated step one earlier in the month. Doc. 51-10 at 6–8. Dr. Louis denied Rollins' second appeal. Doc. 53-22 at 16.

[17] The Faculty Council met *after* the deadline had expired for Rollins to file step three of his grade appeal.

Rollins' grade appeal stands alone and his failure to complete it does not cast doubt on the APC's decision.

g.    Alleged arbitrary denial of the opportunity to remediate

Finally, Rollins contends that Defendants arbitrarily denied him the opportunity to remediate Dental Anesthesia, as purportedly required by the Guidelines and Dental Anesthesia syllabus. Docs. 50-2 at 5; 53-4 at 5. Relevant here, the Guidelines state that "the APC will make recommendations to the Associate Dean regarding promotion, probationary status, repetition, remediation, and dismissal," that "[t]he final decision of academic status rests with the Associate Dean," and that one of the conditions that "may justify the APC's recommendation for . . . dismissal" is "[a]ny failing grade." Doc. 50-2 at 1, 2. As such, when read as a whole, the plain language of the Guidelines belies Rollins' assertion that he is guaranteed remediation.

The Dental Anesthesia syllabus also fails to support Rollins' contention. Based on the evidence before this court, the syllabus, which states simply, "3. Remediation  Essay Exam on selected topics or oral exam," doc. 56-15, outlines the types of remediation allowed if the APC and associate dean approve remediation. Docs. 51-9 at 6; 51-3 at 13. Unfortunately for Rollins, unlike the basic science courses, he had no guarantee of remediation in Dental Anesthesia, as

30

evidenced by Dr. Louis' statement to Dr. Tilashalski that he "will need approval [from the APC] before [Rollins] can remediate." Docs. 53-15 at 8; 51-9 at 6. In fact, Rollins acknowledged this point in an email to Dr. Louis: "I had a misunderstanding of remediation. Apparently, there is a different policy for your course that does in fact differ from the basic science courses with regards to a 'retake' examination[]." Doc. 51-10 at 16. As Dr. Louis testified, he included the remediation section on the syllabus "because the students want to know if remediation was assigned, what might be some options," doc. 51-3 at 5, and that Rollins "was not permitted to remediate because he did not meet the criteria for remediation, and that was he did not–based on my submission of his failing grade to the APC, they did not recommend remediation," doc. 51-3 at 13. Absent a showing by Rollins that Dr. Louis or the APC allowed remediation to a similarly situated student in a Dental Anesthesia course, he cannot meet his burden of establishing that he was arbitrarily denied the opportunity to remediate.[18]

---

[18] The record shows that only one other student failed a first year Dental Anesthesia course taught by Dr. Louis, and that student failed due to withdrawing from the SOD. Docs. 53-33 at 2; 51-3 at 11–13. Rollins identified four other students who failed equivalent courses, Pain & Anxiety Control and Pain & Anxiety Management, taught by Dr. Louis, and were allowed remediation. *See* docs. 62 at 17–18; 56-6 at 1–3. However, based on the enrollment dates, these students failed the courses while in their upperclass years, doc. 56-6 at 2–3, and, unlike Rollins, after demonstrating during their first year that they had the aptitude to succeed at the SOD. Because these students failed the equivalent course as upperclass students, they were not similarly situated to Rollins. As such, there is no evidence in the record to establish that Dr. Louis or the SOD treated Rollins less favorably than other similarly situated students.

31

In sum, Dr. Louis, the APC, and the Faculty Council carefully and deliberately followed the Guidelines when denying Rollins' grade appeal and dismissing him from the SOD. Therefore, Defendants did not violate Rollins' procedural due process rights. Consequently, their motions for summary judgment on the procedural due process claim are due to be granted, and Rollins' motion is due to be denied.

### 2.    *Substantive Due Process*

Rollins also raises a substantive due process claim. "[T]he Supreme Court laid out a very narrow standard of substantive review over academic decisions." *Haberle*, 803 F.2d at 1539 (citing *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214 (1985)). The decision to dismiss a student should "rest[ ] on academic judgment that is not beyond the pale of reasoned academic decision-making when viewed against the background of [the plaintiff's] entire career . . . ." *Ewing*, 474 U.S. at 227–28. Furthermore,

> [w]hen judges are asked to review the substance of a genuinely academic decision, such as this one, they should show great respect for the faculty's professional judgment.  Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.

*Id.* at 225. Courts should refrain from second guessing faculty decisions because

"[i]f a 'federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies,'" *id.* at 226 (quoting *Bishop v. Wood*, 426 U.S. 341, 349 (1976)), "far less is it suited to evaluate the substance of the multitude of academic decisions that are made daily by faculty members of public educational institutions – decisions that require 'an expert evaluation of cumulative information and [are] not readily adapted to the procedural tools of judicial or administrative decisionmaking.'" *Id.* (quoting *Horowitz*, 435 U.S. at 89–90). As such, "[u]niversity faculties must have the widest range of discretion in making judgments as to the academic performance of students and their entitlement to promotion or graduation." *Id.* at 225 n.11.

a.   <u>Alleged inaccurate information by Dr. Louis regarding grade curve</u>

Rollins takes issue with Dr. Louis' statement to the Faculty Council that Rollins failed Dental Anesthesia even though Dr. Louis "curved the grades and [Rollins] still didn't meet the criteria, . . . he wasn't on the borderline." Doc. 56-39 at 35. There is no constitutional violation, however, because this was an accurate statement in light of Rollins falling short of the 69.1% score that Dr. Louis used as a cutoff to curve the grades to a "C."[19] Doc. 51-3 at 14. It seems from the evidence,

---

[19] In his briefing, Rollins contends that Dr. Louis lied about curving and that Dr. Louis actually testified that he did not curve the grades. However, the portion of Dr. Louis' testimony that

however, that Rollins may be challenging instead Dr. Louis' decision to not utilize

the scaling system he used in 2011 that resulted in all failing grades becoming

"C"s. As Dr. Louis explained, he made the decision after performing a

psychometric analysis that revealed the test was harder for the 2011 class as a

whole:

> Q:  All right.  On 2012, you told me you did the psychometric analysis.  Did you also do scaling?
>
> A: Well, I did a–in the psychometric process, I gave–or, excuse me, in the review of the exam, the actual psychometrics, there were several questions that had fared poorly. So in the process, there was–you can see that there were more As than, you know–excuse me, very few As. So once the psychometrics was done, I did scale the grades because of the–this exam was harder for the class.
>
> Q: So you did scale the 2011 exam?
>
> A: Yes.
>
> Q: All right.  By how many points?
>
> A: Well, that's a good question.  I would have to look at it and answer. . . .
>
> Q:  There was a letter grade shift for the students in the bottom?
>
> A: Yes.

---

Rollins cites to support his contention is one in which Dr. Louis discusses the "scaling" process he used in 2011 that involved psychometric analysis. That Dr. Louis testified he saw no need to utilize similar psychometric analysis in 2012 because of the overall strength of the class does not mean that he did not actually curve the 2012 grades.

Q:  So all the people who made [ ] Cs had Fs?

A: Yes.

Q: Well, what could Lee [Rollins] have had lower than an F?

A: Oh, I'm sorry.  In the – which one are we talking?

Q:  I'm talking about 2012.

A: Oh, in 2012.  Okay.  I'm sorry.

Q: I'm sorry if I may not have made it clear.  My question was:–you had told me earlier with regard to 2011 you had done the psychometric analysis and scaled.  And I said is that correct, and you said yes.  I said with regard to 2012, Lee Rollins' class, did you also do both the psychometric analysis and scaling?

A: Well, I looked at the exams as far as the distribution of the grades, particularly with regards to the class as a whole.  And after the evaluation of the class as a whole, including the number of As, Bs, et cetera, that I did not feel that this – there was no room for scaling. The best grade here, we have a 98.1.  So the actual exam is – or the actual performance of the class was high, so the – additional scaling was not warranted.

Doc. 51-3 at 44. While Rollins may perhaps believe that Dr. Louis should have scaled the 2012 grades as he scaled the 2011 grades, it is clear from Dr. Louis' testimony that he saw no need to do so because the overall success of the 2012 students proved that, unlike the 2011 class, "the exam was [not] harder for the class." *Id.* Dr. Louis' failure to scale the grades in 2012 does not violate Rollins' substantive due process rights because Rollins has no credible basis to contend

that Dr. Louis substantially departed from academic norms, especially where, as here, Rollins was the only student to fail the course and did not earn the 69.1% cut-off Dr. Louis used to round a grade to a "C." Therefore, Rollins has failed to show the necessary arbitrariness or capriciousness for a constitutional violation.

   b.   Alleged violation of Rollins' rights based on remediation statistics

   Rollins asserts that the SOD departed substantially from acceptable academic norms and acted arbitrarily because of the 54 students who failed an SOD course during a ten-year period, he was the only one denied remediation.[20] Doc. 55 at 2–3, 28. Unfortunately for Rollins, absent the specific facts of each case, this evidence in itself does not establish a substantial departure from accepted academic norms. Under the Guidelines, "remediation is not a prerogative of the course director" in non-basic science classes, and is instead "a determination by the associate dean of academic affairs after consultation with the . . . [APC]." Docs. 51-9 at 6; *see also* doc. 53-15 at 8 (Dr. Louis' email to the dean stating "As per our conversation, I will need approval before the student can

---

[20] Rollins singles out Comparator Three in particular, whom Rollins contends that the SOD allowed to remediate Growth and Development even though she failed the mid-term and final examinations. Doc. 55 at 28. The reliance on Comparator Three misses the mark because she was a second year student and Growth and Development was "the only failing grade that she [had] received" during her academic career. Doc. 56-55 at 1. The court will not second guess the SOD's decision to treat a upperclass student with a proven academic record more favorably than a first year student. *See Ewing*, 474 U.S. at 226.

36

remediate."). As Rollins himself acknowledged to Dr. Louis, "I had a misunderstanding of remediation.  Apparently, there is a different policy for your course that does in fact differ from the basic science courses with regards to a 'retake' examination[]." Doc. 51-10 at 16. In other words, Dr. Louis was simply following the SOD's remediation guidelines. Critically, there is no evidence in the record that Dr. Louis applied the guidelines differently to other students. Moreover, the failure to offer Rollins remediation does not cast doubt on the fact that the APC and Faculty Council followed the Guidelines and that Rollins failed Dental Anesthesia, every graded assessment in Gross Anatomy, and the first two examinations in Fundamentals I. This record was sufficient to support dismissal under the Guidelines. *See* doc. 50-2 at 1–2. Therefore, in the absence of any other compelling evidence, especially evidence that the other 53 students also had a similar <u>overall</u> record as him, Rollins has failed to establish the necessary substantial departure and arbitrariness to sustain his claim.

c.   <u>Alleged arbitrary and capricious decision by Dr. Reddy</u>

Rollins' next contention is that Dr. Reddy acted arbitrarily and capriciously when he adopted the dismissal recommendation that the Faculty Council purportedly based on inaccurate information presented to it by Dr. Tilashalski. The court previously addressed Rollins' contentions that Dr.

37

Tilashalski provided inaccurate information and found them unpersuasive. *See*

Section III.B.2(b).  Furthermore, Dr. Reddy's decision to accept the Faculty

Council's recommendation was not a substantial departure from the norm because

the APC and Faculty Council followed the Guidelines, reviewed pertinent

information relevant to Rollins' academic performance, allowed Rollins to present

further information and witnesses in support of his appeal, and solicited the

opinions of Rollins' professors and advisor. In short, because the APC and Faculty

Council properly followed the Guidelines, Dr. Reddy's decision to accept their

recommendation cannot establish a constitutional violation.

        d.    <u>Alleged faculty bias</u>

     Rollins' final contention in support of his substantive due process claim is

based on alleged bias against him that purportedly influenced his dismissal.[21] As

the first example of bias, Rollins points to Dr. Tilashalski's report to the Faculty

Council about Rollins' remedial paper: "Tilashalski told the FC, regarding

Rollins's paper . . . that perhaps they should say they told him to do the paper, and

fail him on the remediation. That demonstrates clear bias." Doc. 61 at 24. There

---

[21] Rollins also asserts that Dr. Tilashalski used a distorted record to "orchestrate[] a decision from the APC to terminate Rollins" and provided the same misinformation to the Faculty Council. *See* docs. 53-1 at 1; 53-25 at 1. Rollins' argument is based on the same factual contentions that he presented in his procedural due process claim that the court found were unsubstantiated by the record. *See* Section III.B.2., *supra*. Those same arguments also fail to support his substantive due process claims for the reasons previously stated by the court.

are several problems with this contention however–first, the Faculty Council
rejected Dr. Tilashalski's suggestion; second, Dr. Tilashalski did not have a vote
on the Faculty Council; third, Dr. Tilashalski was not the only person the Faculty
Council heard from; and, finally, in light of evidence that one member of the
Faculty Council read the paper, questioned Rollins about it, and expressed
concerns that Rollins could not answer questions about the contents of the paper,
doc. 56-41 at 13–14, the Faculty Council clearly had a basis independent of Dr.
Tilashalski to assess Rollins with regards to the remedial paper. Likewise, Dr.
Tilashalski's statements to the Faculty Council that he suspected that Rollins did
not write his own appeal and that he could not recall the last time a SOD student
failed Dental Anesthesia, docs. 56-39 at 28; 56-40 at 1; 56-10 at 2, while
inappropriate, fail to cast doubt on the proceedings as a whole or overshadow the
great weight of evidence the committee considered. In fact, the Faculty Council
meeting minutes indicate that, like the APC, it based its decision on the specific
factual information it had regarding Rollins' academic performance. *See* doc. 56-8.
Based on the record before the Faculty Council and the APC and each committee's
respective deliberations, this court has no legal basis to question their expert
evaluation of Rollins' academic record. *See Horowitz*, 435 U.S. at 90.

      As further evidence of bias, Rollins argues that Dr. Waite, who denied his

grade appeal, should have recused himself from the Faculty Council's vote. The court disagrees because the grade appeal and academic status appeals are two separate procedural options. As its name implies, the grade appeal focuses on one single course, whereas the academic status review considers the student's entire academic record. Significantly, there is no evidence that Dr. Waite failed to properly consider the two appeals based on the information Rollins submitted at each level. At any rate, Rollins foreclosed his opportunity for an independent review of Dr. Waite's decision regarding his grade appeal by failing to complete step three of that process. Doc. 50-2 at 2. Therefore, the court has no basis to assign bias to Dr. Waite.

In short, Rollins failed to establish that the SOD substantially departed from acceptable norms or that Defendants failed to exercise professional judgment. *See Ewing,* 474 U.S. at 225. Therefore, Rollins' motion for summary judgment on his substantive due process claim is due to be denied, and Defendants' motions are due to be granted.

### C.    Titles VI and IX and Equal Protection[22]

---

[22] Rollins is only pursuing the Title VI and IX claims against UAB. However, because the analysis for these two claims is the same as the analysis for the equal protection claims that Rollins is pursuing against both defendants, this section applies equally to Dr. Reddy. For the reasons stated *infra*, Dr. Reddy's motion on the equal protection claim is due to be granted.

Rollins contends also that Defendants violated his rights under the Equal Protection Clause and that UAB discriminated against him in violation of Titles VI and IX, by treating him less favorably than Comparators One and Two, dismissing him from the SOD, and denying his request to remediate Dental Anesthesia.[23] To sufficiently state a claim, because "the Equal Protection Clause requires government entities to treat similarly situated people alike," *Campbell v. Rainbow City, Ala.*, 434 F.3d 1306, 1313 (11th Cir. 2006), Rollins "must allege that 'through state action, similarly situated people have been treated disparately,' . . ., and put forth evidence that [the] actions were motivated by" gender or race. *Draper v. Reynolds*, 369 F.3d 1270, 1278 n.14 (11th Cir. 2004) (quoting *Thigpen v. Bibb Cnty. Sheriff's Dep't*, 223 F.3d 1231, 1237 (11th Cir. 2000). As for the Titles IX and VI claims, Title IX "was modeled after Title VI of the Civil Rights Act of 1964, which is parallel to Title IX except that it prohibits race discrimination, not sex discrimination, and applies in all programs receiving federal funds, not only in education programs. The two statutes operate in the same manner, conditioning an offer of federal funding on a promise by the

---

[23] Rollins also asserts, as evidence of discrimination, that Dr. Tilashalski failed to inform the APC and Faculty Council of the precedent in Gross Anatomy and that the Dental Anesthesia syllabus and Academic Guidelines required remediation. However, these contentions fail for the reasons stated previously by the court. *See supra*, Section III.B.1.(c),(g).

41

recipient not to discriminate . . . ." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524

U.S. 274, 286 (1998) (internal citations omitted). Therefore, when analyzing Title

IX, courts should focus on the structure of Title VI, 42 U.S.C. § 2000d. *Franklin v.

Gwinnett Cnty. Pub. Sch.*, 911 F.2d 617, 622 (11th Cir. 1990), *rev'd on other

grounds*, 503 U.S. 60 (1992). Consequently, because "discrimination that violates

the Equal Protection Clause of the Fourteenth Amendment committed by an

institution that accepts federal funds also constitutes a violation of Title VI,"

*Holton v. City of Thomasville Sch. Dist.*, 425 F.3d 1325, 1329 n.1 (11th Cir. 2005)

(quoting *Gratz v. Bollinger*, 539 U.S. 244, 276 n.23 (2003)), the court will utilize

the same analysis for the Equal Protection and Titles VI and IX claims.

Specifically, the court will determine first whether Defendants treated similarly

situated students disparately, and then whether gender or race animus motivated

the disparate treatment.

### 1. *Equal Protection and Title IX (gender)*

Rollins contends that UAB violated his rights under Title IX and the Equal

Protection Clause when it allowed Comparator Two, a white female, the

opportunity to repeat the first year.  Docs. 20 at 13–17; 50-1 at 66. To prevail,

Rollins must establish that Comparator Two is similarly situated, that UAB treated

her more favorably because of her gender, and "that [Rollins' dismissal] was

motivated by an intent to discriminate." *Elston v. Talladega Cnty. Bd. of Educ.*, 997 F.2d 1394, 1406 (11th Cir. 1993). Where, as here, Rollins is relying on circumstantial evidence, Rollins must show that Comparator Two is "nearly identical to [Rollins] to prevent [this] court[] from second-guessing a reasonable decision by [UAB]." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004).

Rollins is not similarly situated to Comparator Two because a review of their respective academic records show that Comparator Two had a better overall record. For example, in the spring semester, she earned three "B"s, four "C"s, and one "F" in Cardiovascular and Renal Systems. Doc. 53-1 at 2. While on first brush these final grades are comparable to Rollins' four "B"s, three "C"s, and one "F" in Dental Anesthesia, doc. 53-1 at 8, a closer look paints a different picture. Specifically, Comparator Two only required remediation in Cardiovascular and Renal Systems, where she earned a 65.94%, doc. 53-1 at 8, and passed her other classes, albeit with marginal grades (for example, a final grade of 69.83% in Dental Anesthesia that rounded to a 70%, and a 70% on the Medical Emergencies final examination). In contrast, in addition to failing Dental Anesthesia, Rollins also failed every assessment in Gross Anatomy with a semester average of 53.3%, and only made a "C" due to passing the comprehensive competency examination

43

that the instructor allowed him to take despite failing to reach the 60% threshold

necessary for remediation. Although Rollins would prefer that the court focus only

on his post-remediation grades, the record is clear that, unlike Comparator Two,

the APC and the Faculty Council found it significant that, prior to remediation,

Rollins finished the semester with two failing grades. Moreover, the APC and

Faculty Council also factored that, during the fall semester, Rollins failed the first

two examinations in Fundamental I, a course Rollins previously took while in

graduate school. Therefore, based on this record, Rollins has failed to establish

that he is similarly situated to Comparator Two.

Alternatively, even if Rollins is similarly situated to Comparator Two,

Rollins' gender claims still fail because of the absence of discriminatory intent. To

show discriminatory intent, Rollins relies initially on *Gossett v. Okla. ex rel. Bd. of*

*Regents for Langston Univ.*, 245 F.3d 1171, 1180 (10th Cir. 2001), in which the

university failed to give a male student an opportunity to remediate. *Gossett* is

distinguishable, however, because the plaintiff in that case presented evidence of a

history of discriminatory practices and arbitrary and capricious decisions towards

male students. *Gossett*, 245 F.3d at 1178 n.2. Specifically, the university displayed

gender bias by failing male students without any opportunity for remediation,

whereas instructors counseled the female students and offered them incomplete

grades and remediation. *Id.* Unfortunately for Rollins, there is no evidence that

UAB applied the remediation policies in a discriminatory manner.  In fact, of the

53 other students Rollins references whom the SOD allowed to remediate over a

ten year period, 27 (50.9%) were male. *See* doc. 56-6. More importantly, the SOD

allowed Rollins to remediate Gross Anatomy even though his grade failed to meet

the minimum threshold requirement, and only denied him remediation in Dental

Anesthesia after the APC and Faculty Council reviewed his academic record and

determined that it was unlikely that he could successfully complete the SOD.

Therefore, *Gossett* does not help Rollins.

     As additional evidence of discriminatory intent, Rollins contends that 1) Dr.

Tilashalski did not present erroneous information about Comparator Two to the

APC and Faculty Council, 2) Dr. Tilashalski did not inquire into Comparator

Two's pre-SOD grades or run her work through a plagiarism program, 3) the

grading inconsistencies in Dental Anesthesia favored Comparator Two, and 4) Dr.

Louis may have manipulated the Dental Anesthesia grades. For the reasons that

follow, the court finds that none of these contentions establishes evidence of

discriminatory intent. First, the emails Dr. Tilashalski sent the APC for

Comparator Two also reported initially an incomplete list of grades similar to the

one on Rollins, and, as previously discussed in Section III.B.1(b), Dr. Tilashalski

45

subsequently presented accurate and complete information about Rollins to the APC and Faculty Council. *See* doc. 52-23 at 1–2, 5–7. Second, Rollins' contentions regarding the plagiarism program and the pre-SOD grades are non-starters because, unlike Rollins, Comparator Two did not submit a paper in support of her appeal, there is no evidence in the record that she took any of the first year courses prior to enrolling at the SOD, and Rollins' graduate school grades in Fundamentals I and II were relevant to the APC and Faculty Council's evaluation of his academic performance. Third, the grading inconsistencies in Dental Anesthesia had no impact on Comparator Two or Rollins' grades. *See* doc. 43-3 at 22, 24. The relevant issue here centers on the mid-term examination where a grading inconsistency occurred presumably because of a "computer issue."[24] Doc. 51-3 at 19. Although Rollins and Comparator Two provided the same incorrect answer to one question, Comparator Two received full credit or 1.45 points. Docs. 40-1 at 6; 40-2 at 18; 51-3 at 17–18. However, according to Dr. Louis, even without the grading error, Comparator Two's final grade would have remained a "C," and Rollins' a "F," doc. 43-3 at 22, 24, and Rollins has failed to present the court with any evidence to rebut this contention. Rollins and Comparator Two also answered a second question incorrectly, but Rollins

---

[24] The examinations and the grading were conducted by a computer. Doc. 51-3 at 19.

received zero points and Comparator Two received full credit. According to Dr. Louis, the discrepancy is presumably based on his utilization of psychometric analysis, which gave Comparator Two credit for providing an answer that was closer to the correct answer than Rollins' answer.[25] Docs. 40-1 at 8; 40-3 at 4. However, there is no disparate treatment because, as Dr. Louis pointed out during his deposition, based on similar psychometric analysis, Rollins also received full credit for questions he answered incorrectly. *See* doc. 43-3 at 37–39. In other words, the record before this court does not support Rollins' contention that Dr. Louis treated him less favorably than Comparator Two.

Finally, there is no credible evidence to support Rollins' contention of grade manipulation. Based on Dr. Ramp's testimony that the course director has the ability to "override the computer to give credit or take away credit or change the amount of points for a question," doc. 56-20, and Dr. Louis' testimony about the capability to access a particular student's grades before they are entered, doc. 51-3 at 79–80, Rollins suggests the possibility that Dr. Louis manipulated the data to cause the inconsistent grading of Rollins' and Comparator Two's exams. Doc. 61

---

[25] The question was, "How many 1.8ml carpules of .05% bupivivicaine with epinephrine can be administered to a 75kg individual in a 90 minute period (assume ideal body weight)?" Doc. 40-3 at 4. The correct answer was 10–11. *Id.* Comparator Two answered 8–9, *id.*, and Rollins answered 6–7, doc. 40-1 at 8.

47

at 24–25.  However, bare assertions are insufficient to defeat summary judgment.

*See Ellis*, 432 F.3d at 1326.  Therefore, in the absence of any evidence to support

such an accusation, especially in light of evidence that Dr. Louis used

psychometric analysis to give Rollins and Comparator Two credit for some

questions they answered incorrectly, the court declines to address Rollins' rank

speculation that Dr. Louis tampered with the grades to his detriment. *See id.*

In sum, based on this record, Rollins has failed to meet his burden of

establishing gender discrimination. In fact, the record is replete with testimony

from members of the APC and Faculty Council that demonstrates a decision-

making process free of discriminatory intent. *See* docs. 50-6 at 6, 25, 30; 52-4 at

3– 4; 51-17 at 7–8; 51-18 at 8; 52-1 at 15; 51-19 at 8–9. Therefore, because "the

Constitution does not demand perfection," *E&T Realty v. Strickland*, 830 F.2d

1107, 1114 (11th Cir. 1987), and Rollins failed to establish that he is similarly

situated to or treated less favorably than Comparator Two, or that UAB or Dr.

Reddy intentionally discriminated against him because of his gender, Rollins'

equal protection and Title IX claims fail as a matter of law.

     2.  *Equal Protection and Title VI (race)*

Rollins claims next that UAB violated the Equal Protection Clause and Title

VI by treating him less favorably than Comparator One, a black female who

48

ranked last in the class, and by dismissing him from the SOD to offset on racial

grounds the decision to dismiss Comparator One.[26] As an initial matter, the court is

confounded by Rollins' reliance on Comparator One to show alleged disparate

treatment when the SOD also dismissed Comparator One for academic reasons.

However, even ignoring this fact, the two examples Rollins provide are

unpersuasive. First, ignoring that Dr. Zehren allowed him to remediate Gross

Anatomy even though he scored below the cutoff, Rollins contends that UAB

treated Comparator One more favorably by allowing her to remediate

Cardiovascular and Renal Systems in violation of the syllabus. In actuality, one

can argue that Rollins received more favorable treatment because his grade of

53.3% fell 6.7 points below the minimum cutoff to qualify for remediation in

Gross Anatomy, and yet was allowed to take the competency exam. *See* docs. 53-3

at 5; 53-26 at 3; 56-34 at 1. In contrast, although the Cardiovascular and Renal

Systems course syllabus is clear that "[s]tudents who receive a course grade below

65 will receive an F for their grade with NO chance of remediation," doc. 53-1 at 7

---

[26] Rollins also contends as evidence of discrimination the following: 1) Rollins was the only one
of 54 students not allowed to remediate, retest, or repeat, 2) Rollins was academically superior to
Comparator Two, and 3) Dr. Tilashalski presented skewed information that biased the APC and
Faculty Council against Rollins. However, the court previously addressed Rollins' assertions
regarding Dr. Tilashalski's bias. Moreover, Comparator Two, a white female, is not a proper
comparator for Rollins' race based claim. Finally, Rollins' bare assumptions regarding the other
students are insufficient to survive summary judgment. *Ellis*, 432 F.3d at 1326.

(emphasis in original), Dr. Carrie Elzie, the course director, used her discretion to round Comparator One's average by 0.14 points from 64.86% to 65%, which qualified Comparator One for remediation, *see* doc. 53-1 at 6 ("Students who receive a grade between 65-69.99 may be eligible for remediation."). Put simply, Rollins received the same consideration as Comparator One when his Gross Anatomy professor allowed him to remediate despite posting a final grade well outside the cutoff.

Next, Rollins claims that UAB treated Comparator One more favorably by rounding up her grade in PCD: Operative. According to Dr. Ramp, the course director, although she utilized a practice of rounding a 79.5% to a "B," doc. 56-20 at 24, she used her discretion to round Comparator One's 79.3% to a "B," *id.* at 19. This 0.2 deviation is the basis for Rollins' contention of alleged favorable treatment. Unfortunately for Rollins, his contention that Dr. Ramp's decision establishes disparate treatment is unavailing, in part, because Rollins did not receive any grades that were only 0.2 points short of justifying the course director to round up the grade to the next letter grade. Moreover, Comparator One would have passed the course with a "C," even without the rounding of her grade. More significantly, Comparator One received no real benefit from the rounding because the SOD dismissed her from the program.

Perhaps because Rollins recognizes that he cannot claim credibly that he
Defendants treated him less favorably than Comparator One in light of her
dismissal from the SOD, it seems Rollins' primary contention is that the SOD
discriminated against him precisely because it treated him exactly as Comparator
One. According to Rollins, UAB dismissed him from the SOD solely to
manufacture a defense in the event Comparator One subsequently challenged her
dismissal on racial grounds. Basically, Rollins contends that Defendants
concluded they had to dismiss him to purportedly "balance out" the decision to
dismiss Comparator One. *See* doc. 61 at 25.

There are major flaws, however, in Rollins' contention. First, as Rollins
admits, he has no evidence to establish that Defendants dismissed him because of
their desire to avoid a lawsuit or to "balance out" the dismissal of Comparator
One, and is simply contending that race "possibly" factored into his dismissal. *See*
doc. 50-1 at 69–70. Unfortunately for Rollins, facts, not speculation or conjecture,
are necessary to survive summary judgment. *See Ellis,* 432 F.3d at 1326. Second,
Rollins' contention is also flawed because it relies on obfuscation to support
Rollins' narrative that he was the casualty of a preemptive litigation strike. To
support his contention, Rollins focuses, in part, on Drs. Reddy and Tilashalski's

affidavits[27] in the race discrimination lawsuit Comparator One filed to challenge

her dismissal, which he claims demonstrate Defendants dismissed him to "balance

out" Comparator One's dismissal. Doc. 61 at 25. However, this narrative ignores

that Rollins' academic record, like Comparator One's, warranted dismissal. In that

respect, Rollins' dismissal is not racially motivated simply because the other

person dismissed was African American. Moreover, even construing the evidence

in the light most favorable to Rollins, the affidavits fail to establish that the SOD

dismissed Rollins in anticipation of creating a defense to a then non-existent

lawsuit. Rather, when read in their totality, the affidavits merely explain UAB's

reasoning for dismissing Comparator One, i.e. her academic performance, and

only mention Rollins to rebut Comparator One's contention that racial animus

played a role in her dismissal. While obviously Rollins believes he was a better

student than Comparator One–and he was based on the class rank, that the SOD

also dismissed Rollins and subsequently referenced him in Comparator One's

lawsuit does not imply that Defendants had an impermissible motive for

dismissing Rollins.

---

[27] The relevant language in the affidavits state: Dr. Reddy–"[a]t approximately the same time as plaintiff's dismissal, the SOD also dismissed a white male student whose academic performance was inadequate, but better than [Comparator One's]," doc. 56-4 at 3; and Dr. Tilashalski–"[a]t approximately the same time as [Comparator One] was dismissed, a white male student in the same year was also dismissed from the SOD," *id*. at 5.

The court is also not persuaded by the deposition testimony Rollins references in further support of his contention that his race factored in his dismissal. Rollins cites to Dr. Ramp's testimony regarding the APC meeting that, "'It,' meaning race, didn't have to be stated. I know the students. So I guess–I'm sure race went through my head." Doc. 56-2 at 33. To the extent Rollins is claiming that this testimony suggests a bias against him by Dr. Ramp, the record is clear that Dr. Ramp abstained from the APC's vote to dismiss Rollins because of her role as Rollins' adviser, and that she advocated for the Faculty Council to overturn the decision. Doc. 53-8 at 1–2. Moreover, Dr. Ramp's testimony fails to establish that racial animus factored in the APC's decision to dismiss Rollins. More importantly, knowing the race of the subject of a decision is not tantamount to making a decision based on race.

Likewise, Rollins' reliance on Dr. Eleazer's testimony regarding the APC's deliberations also fails to establish that racial animus factored in Rollins' dismissal.  The relevant passage Rollins cites states:

Q:  Dr. Eleazer, what would be your reason for believing all three students should have repeated the year?

A:  I believe it would be fair to all three of them to give them an opportunity to demonstrate that they were, indeed, capable of progressing to the, to the next level of dental school.  And, frankly, I weighed the race of [Comparator One] in my deliberation.

Q:  And what do you mean by that?

A:  I mean it would be difficult to dismiss a black female [Comparator One] and promote a white female [Comparator Two] or white male [Rollins].

Q:  Would that particularly be true given that they were all kind of clustered together at the bottom?

A:  Yes.

Q:  Of course, I guess, if you terminated or dismissed [Comparator One] from the program, a black female, and dismissed Lee Rollins, a white male, then that would kind of balance itself out, correct?

A:   In a manner of speaking, I suppose.  In a manner of speaking, yes.

Doc. 56-3 at 9.[28] When read in its totality, Dr. Eleazer's testimony only supports

---

[28] Counsel for Rollins also asked Dr. Eleazer about the affidavits in his attempt to prove a racial motivation:

> Q:  Have you had a chance to review [Dr. Reddy's affidavit in support of a motion in Comparator One's case]?
> A:  I have, yes.
> Q:  Now, you would have seen in Paragraph 11 were Dean Reddy says [Comparator One's] dismissal from the School of Dentistry had nothing to do with her race.
> A:  Yes.
> Q:  And then Paragraph 13, he says, 'At approximately the same time as plaintiff's dismissal' – plaintiff in that case being [Comparator One] – 'the School of Dentistry also dismissed a white male student whose academic performance was inadequate but better than [Comparator One's].'  Do you have any reason to believe that's anybody other than Lee Rollins?
> A:  I do not.
> Q:  The APC – you only dismissed two students from that class, the 2011-12 class, right?
> A:  Right.
> Q:  And that would be [Comparator One] and Mr. Rollins?
> A:  Right.

the reasonable inference that he wanted to ensure that the APC treated <u>all three</u>

students similarly because of their identical academic record. In fact, when Dr.

Eleazer mentioned that he considered race, it was not to discriminate against

Rollins, but in the context of ensuring that Rollins, Comparator One, and

Comparator Two received the same opportunity to repeat the first year and to

demonstrate that they could progress to the second year. This is even more evident

because Dr. Eleazer voted <u>against</u> Rollins' dismissal. Doc. 51-20 at 7.

Consequently, Rollins has no credible basis to contend that Dr. Eleazer's

comments demonstrated racial bias against Rollins.[29]   While Rollins obviously

---

        Q:  And we know Mr. Rollins is a white male, and we know his academic performance
           was a little better than [Comparator One's], correct?
        A:  Correct.
        Q:  Is it a fair inference, Dr. Eleazer, that Dean Reddy seems to be saying evidence that
           there was no discrimination against [Comparator One] was that Mr. Rollins was
           dismissed at the same time?
        A:  That's correct, <u>I believe Dr. Reddy would take special pains to make sure that there</u>
           <u>was no unfairness.</u>

Doc. 56-3 at 19-20 (emphasis added). This exchange does not help Rollins' narrative that he was
selected to "balance out" the dismissal of Comparator One. If anything, it supports Dr. Reddy's
contention that he ensured a fair process for all students involved.

[29] To the extent that Rollins is claiming Dr. Eleazer's comments suggest that others considered
Rollins' race, there is no factual support for such a contention. In fact, Dr. Eleazer added also
that, in his opinion, no one based their decision on race or gender:
        Q:  Okay.  So, in your opinion, the APC did not show – did not discriminate
           against anybody based on their race or gender –
        A:  No.
        Q:  – in making their decisions?
        A:  No one at any time made any comment in my recollection.
        Q:  Okay.  And whether they made a comment about it or not, do you believe that

believes he deserved a chance to repeat or to remediate–an assessment Dr. Eleazer

shared, Dr. Eleazer's desire to ensure that the APC decision was fair and free of

racial bias does not mean that the SOD dismissed Rollins because of his race or to

"balance out" the dismissal of Comparator One.

Under the facts here, Rollins has failed to demonstrate any racial animus in

the APC's decision to dismiss him from the SOD. To the contrary, the APC

reached its decision after evaluating Rollins' academic record. Among other

things, the APC considered that Rollins failed the first two exams in Fundamentals

I–a class Rollins took as a graduate student, passed Medical Emergencies

primarily because of a group project, passed Gross Anatomy because the instructor

made an exception and allowed him to remediate, and failed Dental Anesthesia

even after the course instructor curved the grades. As Dr. Tilashalski testified, the

APC discussed that Rollins' performance showed a downward trend even though

the APC "[couldn't] say [Rollins] didn't do well because he wasn't trying, he was

[in class and in laboratories] . . . and expresse[d] genuine interest . . . and said he

---

discrimination or bias came into the decision?
A:  No, my statement is I think that it was very convenient to have dismissed Mr.
Rollins in addition to an African-American because it is evidence that there is no
discrimination. . . .  So, I believe we bent over backwards to demonstrate that
there was no discrimination.  Never discussed openly, that [is] just was my own
thought.

Doc. 56-3 at 58.

wanted to do well . . . ." Doc. 56-39 at 26. Unfortunately, sometimes a desire to do

well and a strong work ethic have no correlation to overall aptitude. Based on

Rollins' record and the trends it showed, the APC concluded that Rollins lacked

the necessary attributes to successfully complete the program: "[the APC] looked

at that [record] as somebody that . . . we are not sure can make it through." *Id*. at

28. Although Rollins is free to disagree with the APC, he cannot, however,  mask

his academic record by claiming that racial bias or an alleged impermissible

concern about "balancing out" a selection decision caused his dismissal, especially

when, as here, the record does not support his contention. Ultimately, because "the

Equal Protection Clause requires government entities to treat similarly situated

people alike," *Campbell*, 434 F.3d at 1313, and UAB treated Rollins no differently

than Comparator One, Rollins' claim fails, and summary judgment is due in favor

of Defendants.

## IV. <u>CONCLUSION</u>

Consistent with this opinion, the court will issue a separate order denying

Rollins' motion for summary judgment and granting Defendants' motions.

Done this 29th day of September, 2014.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE